**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 22, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SHAWRON LOUNDS,

      Plaintiff-Appellant,

v.

LINCARE, INC.,

      Defendant-Appellee.

No. 14-3158

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:13-CV-01091-RDR)**

---

Anne Schiavone, Holman Schiavone, LLC, Kansas City, Missouri (Sophie A. Woodworth, Holman Schiavone, LLC, Kansas City, Missouri, with her on the briefs), for Plaintiff-Appellant.

Stephanie N. Scheck, Stinson Leonard Street LLP, Wichita, Kansas (Jesse Tanksley, Stinson Leonard Street LLP, Wichita, Kansas, with her on the brief), for Defendant-Appellee.

---

Before **KELLY**, **HOLMES**, and **McHUGH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

      Shawron Lounds appeals from the district court's order granting summary

judgment to her former employer, Lincare, Inc. ("Lincare"), on her claims of a

hostile work environment in violation of 42 U.S.C. § 1981 and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** in part and **reverse** in part. Specifically, we **affirm** the district court's grant of summary judgment on Ms. Lounds's claim for retaliation, but we **reverse** the court's grant of summary judgment on her discrimination claim and **remand** for further proceedings.

## I

On an appeal from a ruling granting summary judgment, "'we examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party,' without making credibility determinations or weighing the evidence." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 953 n.2 (10th Cir. 2012) (quoting *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009)). The following facts are recited accordingly.

## A

Lincare is a nationwide provider of at-home medical services with headquarters in Florida and, as germane here, a satellite facility in Wichita, Kansas. At all times relevant to this appeal, Lincare employed approximately twenty individuals at its Wichita location. Ms. Lounds began working at that office as a customer-service representative in September 2011. She is African-American and, throughout the duration of her employment with Lincare, was the Wichita office's only African-American employee.

2

Suzanne Kraft, the Wichita facility manager, hired Ms. Lounds and was her direct supervisor. Ms. Lounds alleges that when she first reported to work, Ms. Kraft asked if her name was "Shaquita" and, after asking Ms. Lounds to introduce herself in a group setting, said, "I thought your name was Shaniqua!" J.A. at 267 (Mem. for Record, dated Feb. 3, 2012). At least one of Ms. Lounds's co-workers has stated that before Ms. Lounds's start date, Ms. Kraft mentioned having interviewed Ms. Lounds, calling her "the cute black girl," *id.* at 480 (Llamas Dep., dated Oct. 9, 2013), and "Shaniqua or Shanay or something," *id.* at 487.

In October 2011, a truculent male customer phoned the Wichita office and threatened to harm the employees. Ms. Lounds alleges that when she reported the call, Ms. Kraft instructed her to give the customer "attitude," *id.* at 271, and to "get ghetto" with him, *id.* at 111 (Lounds Dep., dated Aug. 21, 2013). Ms. Kraft was overheard commenting about how "mean" this customer was and saying that "by the sounds of his voice she imagined that he was a big African American man." *Id.* at 506 (Renard Dep., dated Oct. 9, 2013). When the customer later visited the office, Ms. Kraft approached Ms. Lounds and said of him, "No offense, he's a . . . little white guy." *Id.* at 111.

On November 14, 2011, Ms. Lounds happened upon some of her co-workers discussing an African-American man who had recently killed his wife. She listened as Kevin Kunz stated, "[W]e need to bring back lynching, because

3

we have enough trees."[1]  *Id.* at 267.  According to Ms. Lounds, Mr. Kunz first attempted to clarify that he was "not racist, and there was nothing wrong with lynching," before he approached her to say, "I'm not trying to offend you[;] it's not like I said 'let[']s go down [to] 9th and Grove (the Black Neighborhood) and drag every black person with a noose, tie them to a truck and drag them after hanging them.'"  *Id.*  When Ms. Lounds objected to his commentary, Mr. Kunz rejoined that she should not be so sensitive.

Ms. Lounds alleges that on January 14, 2012, co-worker Laynee Kempke entered the office, announced that she had "just c[o]me back from the 'Hood' seeing a patient," and began chanting, "BOOM!" and "Boom, Nigga!"  *Id.* at 268.  After that incident, at least one co-worker relayed to Ms. Lounds that Ms. Kempke had previously "said or used the 'N Word,'" most notably by saying "Peace out my Nigga!"  *Id.*  Ms. Lounds told Ms. Kempke that remarks of this nature upset her.

During a staff meeting on January 17, 2012, Ms. Kraft asked co-worker Nathan Van Dever—the only male employee in attendance—if he felt "like a minority."  *Id.* at 268.  At some point in the course of the meeting, Ms. Kraft explained that company vice president Greg McCarthy was planning to visit

---

[1]     Ms. Lounds also notes that during this exchange, Mr. Kunz remarked that people of Vietnamese descent "all ha[ve] bad teeth."  J.A. at 267.  Ms. Lounds claims that her husband is "Black and Vietnamese," *id.*, but she does not press the point further.

4

Lincare's Wichita office; she directed the employees to address Mr. McCarthy by saying, "YES MASSA." *Id.* at 269. One employee present during the incident observed that Ms. Kraft's "'yes, massa' did offend [Ms. Lounds] very visually" and that Ms. Lounds "had tears in her eyes" after the meeting. *Id.* at 506.

On January 26, 2012, during an office pizza lunch, Mr. Kunz "kept saying things like 'I never go in the ghetto[;] the hood has gangsters.'" *Id.* at 273. Shortly thereafter, he approached Ms. Lounds and said, "you know . . . the HOOD!" *Id.* A co-worker standing near Ms. Lounds asked what Mr. Kunz meant; Mr. Kunz replied that there were "a lot of minorities there [i.e., in the 'ghetto'] and it's dirty, it's run down." *Id.* at 482.

Mr. McCarthy visited Lincare's Wichita facility on January 27, 2012. While he was attending a staff meeting, employee Amber Renard reported that "there was some racial commentary [involving Ms. Lounds] that needed [his] attention." *Id.* at 221 (McCarthy Dep., dated Oct. 14, 2013). After the meeting adjourned, Mr. McCarthy spoke privately with Ms. Lounds and learned that she was indeed troubled by some "offensive" statements. *Id.* He asked Ms. Lounds to put these concerns in writing and indicated that he would contact human resources. Mr. McCarthy then called Paula Adams, Lincare's director of employee relations, to request a follow-up investigation regarding Ms. Lounds's allegations.

5

Pursuant to Mr. McCarthy's instructions, Ms. Adams called district manager Jeremy Felts later that day to discuss Ms. Lounds's concerns. Mr. Felts then summoned Ms. Lounds and Ms. Renard for a teleconference with Ms. Adams. During this phone call, Ms. Lounds told Ms. Adams that: (1) Ms. Kempke had said "boom nigga," *id.* at 108, and "peace out nigga," *id.* at 236 (Adams Aff., dated Nov. 19, 2013), in the office; (2) Mr. Kunz had discussed lynching; (3) Mr. Kunz had said that "Hitler would be proud of him because of his blue eyes, but not . . . his black hair," *id.* at 108; (4) Ms. Kraft had instructed employees to address Mr. McCarthy by saying "yes massa," *id.* at 236; (5) Ms. Kraft had asked Ms. Lounds why African-American parents choose names like "Roshonda" and "Shawron" for their children, *id.* at 108, 236; and (6) Mr. Van Dever had asked Ms. Lounds if she smoked Newport cigarettes and "why . . . all black people smoke Newports," *id.* at 108. Ms. Adams and Mr. Felts "mutually agreed" that Ms. Kempke, Mr. Kunz, and Ms. Kraft would be disciplined for their alleged conduct. *Id.* at 236.

On January 30, 2012, Mr. Felts issued final written warnings to Ms. Kempke, Ms. Kraft, and Mr. Kunz, noting that these individuals had "made inappropriate, racially motivated comments in the [workplace]," *id.* at 256, 259, 262 (Final Written Warnings, dated Jan. 30, 2012), and that Ms. Kraft had also "witnessed and allowed other individuals who report directly to [her] to make similar comments in the [workplace]," *id.* at 259. The warning documents

6

advised that subsequent breaches of Lincare's "Anti-Discrimination/Anti-Harassment policy" would result in the "immediate termination of [their] employment." *Id.* at 256, 259, 262. Also on January 30, Mr. Felts led an in-service training of approximately ten minutes in duration "to make sure everyone was clear on [the] company policy on anti-discrimination and harassment."[2] *Id.* at 131 (Felts Dep., dated Oct. 10, 2013). The sign-in sheet from this training indicates that Ms. Kempke attended, but Ms. Kraft and Mr. Kunz did not. *See id.* at 265 (In-Service Record, dated Jan. 30, 2012) (reflecting no signatures by Ms. Kraft and Mr. Kunz); *see also id.* at 468 (Kraft Dep., dated Oct. 10, 2013) (comment by Ms. Kraft that if she *had* attended, "[her] signature would be on the sheet").

In that same general time period, a picture of a garden hung on the wall behind the desk of employee Jennifer Llamas. A customer visiting the Wichita office remarked to Ms. Llamas that he found the picture "pretty" and thought "[it] probably took a lot of slaves . . . to make it [i.e., the garden depicted] look that good, . . . but nowadays it's wetbacks that do that." *Id.* at 482. Ms. Llamas, who is Latina, told both Ms. Lounds and Mr. Felts that the customer's comments

---

[2]        This policy provides that "Lincare will not discriminate or allow discrimination against any employee or applicant on the basis of . . . race, color, [or] ethnic background." J.A. at 176 (Emp. Handbook, filed Nov. 20, 2013). It warns that "[v]iolation of this policy will subject an employee to disciplinary action, up to and including immediate discharge." *Id.* Ms. Lounds received a copy of the policy when she began working at Lincare.

7

offended her. The picture was removed, but only briefly. Ms. Lounds avers that the picture was "a constant reminder to . . . [her], everyday . . . of what that [customer] said." *Id.* at 271. Meanwhile, according to Ms. Lounds, "several employees" were habitually approaching her by saying, "YO! Yo what[']s up?" in "a black accent dialect." *Id.*

On February 3, 2012, Ms. Lounds submitted a document styled "Memorandum for Record" to Lincare's human-resources department. She alleged therein that she felt "bombarded with racial slurs and comments." *Id.* at 269. Specifically, she stated that: (1) Ms. Kempke had upset her by saying "Boom Nigga" in her presence, *id.* at 268; (2) a co-worker had informed Ms. Lounds that Ms. Kempke—in addition to saying "Boom Nigga"—had remarked "more than once" the day Ms. Lounds interviewed for the Lincare position "Peace out my Nigga," and that Ms. Kempke says the "['N Word'] comfortably as she interacts with other Caucasian employees," *id.*; (3) Ms. Kraft had suggested that Ms. Lounds's name was "Shaniqua," *id.* at 267; (4) Ms. Kraft had asked Ms. Lounds—due to her race—about why African-American people name their children "Roshonda," *id.* at 268; (5) Mr. Kunz had referenced lynching and admonished Ms. Lounds not to be so sensitive; (6) Ms. Kraft had asked Mr. Van Dever whether he felt like a minority; (7) Ms. Kraft had instructed employees to say "YES MASSA" to Mr. McCarthy, *id.* at 269; (8) co-workers had used the greeting "YO! Yo what[']s up?" in "a black accent dialect," *id.* at 271; (9) the

8

customer had referenced "slaves" and "wet backs" in relation to the office picture, *id.* at 271; (10) Ms. Kraft had instructed Ms. Lounds to give a customer "attitude," *id.*; (11) Ms. Kraft had said that she thought a customer was a "big black man" and that "his name sounded black," *id.* at 271–72; and (12) Mr. Kunz had remarked that he never visits "the ghetto" or "HOOD," *id.* at 273.

In a February 6, 2012, memorandum to human resources,[3] Ms. Lounds alleged the following: (1) she had been called "Sha-nea-nea" and "Shaquita"—*viz.*, names she considered to be "stereotypical racial trigger[s] for Black American women," *id.* at 276 (Second Mem. for Record, received Feb. 13, 2012); (2) Ms. Kraft had told a group of employees that she thought Ms. Lounds was named "Shaniqua," *id.*; (3) Mr. Kunz had discussed lynching in her presence; (4) Ms. Kraft had said that employees should say "Yes Massa!" to Mr. McCarthy, *id.*; (5) Ms. Kempke had a "habit of returning from seeing a black [customer] and stating how she thought she would be raped, and stating in a loud sing-song voice BOOM-Nigga in [Ms. Lounds's] presence, walking away laughing," *id.*; and (6) she often heard "[e]thnic slurs and racially based jokes," *id.* at 277. Ms. Lounds stated that after Mr. McCarthy's visit her co-workers had given her "the cold shoulder." *Id.* at 277. She further averred that "nothing ha[d] changed" since her January 2012 meeting with Ms. Adams and Mr. Felts. *Id.*

---

[3] Ms. Lounds dated the document February 6, 2011. During her deposition, she indicated that she made a typographical error in that regard: her memorandum should have been dated February 6, 2012.

Midway through February 2012, Ms. Lounds spoke with Mr. Felts and divisional manager Karen Schanbacher, who directly supervised Mr. Felts. Ms. Schanbacher asked "several times" how she could address Ms. Lounds's concerns about the office environment. *Id.* at 142 (Schanbacher Dep., dated Oct. 22, 2013). In response, Ms. Lounds said she suspected that her co-workers were "always talking about her" behind closed doors, and she complained that she had not been properly trained to perform her job duties. *Id.* Ms. Lounds told Ms. Schanbacher and Mr. Felts that her "spirit was gone." *Id.* at 109. Nonetheless, during that conversation, Ms. Lounds did not report any new discriminatory remarks or specifically claim to be in a hostile work environment.

Ms. Lounds had another telephone call with Ms. Adams on March 6, 2012, wherein she stated that she "felt like the 'pink elephant' in the room." *Id.* at 237. Ms. Adams construed the remark as a complaint of awkwardness stemming from the January 2012 discipline of Ms. Kempke, Mr. Kunz, and Ms. Kraft. However, Ms. Adams recalls that "[n]ever once in the conversation did [Ms.] Lounds report any new racial comments in the workplace, allege that she had been subjected to retaliation, or complain of a hostile work environment," *id.*—and Ms. Lounds does not dispute Ms. Adams's account of the call. Based on the foregoing discussion, Ms. Adams believed that the corrective actions discussed *supra* (i.e., the final written warnings and in-service training) "had been effective." *Id.* She

10

asked Linda Feller, who also worked in human resources, to follow up with Ms. Lounds.

Ms. Feller spoke to Ms. Lounds at the Wichita office on March 14, 2012. Her notes from their meeting reflect that Ms. Lounds complained that: (1) co-workers sometimes warned of her presence by saying, "Shhhhh, here she comes," *id.* at 282 (Meeting Notes, dated Mar. 14, 2012); (2) there had been "an instance where a black gentleman" applied for a job, but Ms. Kraft did not want to hire him because he "look[ed] like a convict," *id.* at 283; (3) Ms. Kempke had said "Peace out, my nigga," *id.*; (4) the garden picture (discussed *supra*), which made her uncomfortable, was hanging in the office again; and (5) Mr. Kunz had said, "Shawron, you know where the hood is," and that "black people smoke Marlboros," *id.* at 285. Otherwise, Ms. Lounds indicated that there had been some tension immediately after the discipline of Ms. Kempke, Mr. Kunz, and Ms. Kraft.

On April 6, 2012, Ms. Lounds filed a complaint with the Kansas Human Rights Commission ("KHRC"), alleging that she had been "subjected to derogatory racial comments, slurs, and innuendoes." *Id.* at 287 (KHRC Compl., filed Apr. 6, 2012). Despite claiming therein to have received disparate treatment based on race—treatment which purportedly worsened after she reported it "in retaliation," *id.* at 288—Ms. Lounds offered no specific averments in either regard (i.e., regarding discrimination *or* retaliation). Her human-rights complaint

11

simply indicated that she felt she had been "treated in a demeaning manner, ridiculed, and teased." *Id.* at 287.

**B**

Ms. Lounds received a "documented counseling" on April 26, 2012, for "excessive absenteeism"—specifically, sixteen unscheduled absences since September 2011. *Id.* at 334 (Documented Counseling, dated Apr. 26, 2012). The document reminded her of Lincare's policy prohibiting employees from reporting absences via text message.[4] Additionally, it notified Ms. Lounds that further discipline—including termination—could follow if she did not show immediate, sustained improvement. Although corporate officials assisted with preparing the paperwork, Ms. Kraft testified that she personally decided to issue the documented counseling. Ms. Lounds responded by sending Lincare's human-resources department a "letter of rebuttal" that stated (1) that the documented counseling was retaliatory, and (2) that her supervisors and co-workers had "participated in" racial harassment against her. *Id.* at 290–91 (Rebuttal Letter, dated May 1, 2012).

On May 4, 2012, Ms. Lounds sent Ms. Kraft a text message to advise that she would be absent that day "[d]ue to a hostile workplace." *Id.* at 293 (Text

---

[4] In that regard, the employee handbook states: "Should you find you will be absent or late, you must *personally speak* to your supervisor prior to, or as soon as possible after, your scheduled starting time, giving the reason for the absence or lateness and when you expect to report to work." J.A. at 183 (emphasis added).

Message, dated May 4, 2012). In the message, she described an incident from the previous day in which Mr. Kunz slapped a co-worker's thigh. Ms. Lounds alleged that she "couldn't focus," *id.*, and was "really freaked . . . out," *id.* at 294, but she did not suggest that the episode was racially motivated. She lodged another complaint with the KHRC on May 18, 2012, stating that the documented counseling was "an act of retaliation for having previously filed a discrimination complaint." *Id.* at 307 (Second KHRC Compl., filed May 18, 2012).

On June 22, 2012, Ms. Kraft issued Ms. Lounds a "documented verbal warning" regarding the "unacceptably large number of unscheduled absences" that Ms. Lounds had accrued since her April 26, 2012, documented counseling. *Id.* at 309 (Documented Verbal Warning, dated June 22, 2012). The warning underscored Lincare's policy against registering absences by sending text messages. Mr. Felts, Ms. Kraft, and Ms. Feller (who participated by phone) discussed the write-up with Ms. Lounds that day; they urged Ms. Lounds to "plan in advance, and request [any] time off" and stressed that "[n]o one is allowed to text in" absences. *Id.* at 313 (Meeting Notes, dated June 22, 2012). Ms. Lounds rejoined, "There's a lot of things going on with this place. I have doctor's notes." *Id.* at 312. She indicated that she would "call earlier" to register any future absences. *Id.*

In July 2012, Ms. Lounds sent Lincare's human-resources department another rebuttal letter concerning the documented verbal warning. The purpose of

13

the letter was to dispute her supervisors' representations about text messaging absence notifications. In that regard, Ms. Lounds averred that "[a]ll employees[] text" message in "their absences and to single [her] out [wa]s disparate treatment." *Id.* at 315 (Rebuttal Letter, dated July 16, 2012). She thus concluded that Lincare's true motive for issuing the warning was not to address a perceived attendance issue but, rather, to retaliate against her for complaining of discrimination to the KHRC.

Later that month, Ms. Lounds received a "final written warning" that referenced newly accrued, unapproved absences and stated that Ms. Lounds had sent Ms. Kraft an improper text message on July 20, 2012. *Id.* at 317 (Final Written Warning, dated July 24, 2012). At a meeting to review the final warning,[5] Ms. Lounds reported that she still "fe[lt] like the pink elephant." *Id.* at 319 (Meeting Notes, dated July 24, 2012). She noted that whenever anyone said the word "boom" in the office, Ms. Kempke would interject, "Boom Nigga!" *Id.* She also mentioned for the first time that Ms. Renard—who originally brought racist remarks to Mr. McCarthy's attention—"sa[id] 'BON' to her every day," *id.*, and that Ms. Kraft ignored it. After Ms. Feller ended her participation in the meeting, Ms. Lounds explained that Ms. Renard had upset her by (1) asking "if [Ms. Lounds] knew what a BON was because [Ms. Renard's] boyfriend, who is

---

[5]     This meeting included Ms. Lounds, Mr. Felts, Ms. Kraft, and Ms. Feller (who joined by phone).

14

black, wanted her to call him a Big Ol' Nigger"; and (2) stating that "[t]he coach of [Ms. Renard's son's football] team ha[d] said something about 'all blackies are stupid.'" *Id.* at 320.

When Ms. Kraft subsequently asked about the alleged "BON" exchange, Ms. Renard explained:

> I was . . . talking to [my boyfriend] on the phone laughing, and I said I will not say that, and he [said] you can just say B-O-N. After I got off the phone, [Ms. Lounds] asked me what did it mean. . . . [I said] Big old N and I did not say the word [i.e., the "N-word"] because I don't say the word.

*Id.* at 513. Nonetheless, Ms. Kraft issued Ms. Renard a final written warning for making inappropriate, racially-tinged remarks in the workplace. *Id.* at 516 (Renard Final Written Warning, dated Jan. 27, 2012).

Ms. Lounds submitted another letter of rebuttal regarding her final warning on July 25, 2012, alleging that the warning was retaliatory and referencing "verbal abuse and negative racial overtones that [she] ha[d] to endure on a daily basis." *Id.* at 327 (Rebuttal Letter, dated July 25, 2012). Two days later, Ms. Lounds's mental-health counselor, Dr. Joseph Donaldson, sent a letter to Ms. Feller to report that Ms. Lounds had been subjected to "an ongoing onslaught of verbal abuse and harassing racial comments, slurs, epithets, and innuendos" and "blatant racist verbal attacks." *Id.* at 330–31 (Donaldson Letter, dated July 27, 2012). Dr. Donaldson listed several of the examples enunciated *supra* by Ms. Lounds, but no new discriminatory conduct.

Lincare terminated Ms. Lounds's employment on September 24, 2012, citing "ongoing, excessive absenteeism" as the cause of its decision. *Id.* at 337 (Emp't Termination Notice, dated Sept. 24, 2012). According to the termination notice, Ms. Lounds had missed seven full days of work after the issuance of her final written warning. The notice further stated that Ms. Lounds's number of absences since September 2011 "[c]learly" exceeded the number of paid days off allotted to first-year Lincare employees. *See id.* ("Lincare employees in their first year of employment earn five days of vacation."). In fact, Ms. Lounds had not reported to work on thirty-four separate days. More than twenty of these days were unscheduled absences.

On October 3, 2012, Ms. Lounds responded to her termination by sending another letter to Lincare's human-resources department. After generally alleging that she had been the target of racial discrimination and retaliation, she enumerated the following specific objections: (1) Ms. Kraft had publicly interrupted her to say she thought Ms. Lounds was named "Sha-nea-nea" or "Shaqu[it]a," *id.* at 339 (Rebuttal Letter, dated Oct. 3, 2012); (2) co-workers often said the word "BOOM" and the phrase "BOOM NIGGA" to humiliate Ms. Lounds, *id.*; (3) Ms. Kraft and co-workers asked if Ms. Lounds lived in the "ghetto" and used "slang words stereotypical of African Americans" when addressing her, *id.*; (4) Ms. Kraft advised employees to say "YES MASSA" to Mr. McCarthy, *id.*; (5) Ms. Kraft would "single [Ms. Lounds] out" to give "attitude"

16

to a customer perceived by Ms. Kraft to be "a big black guy," *id.*; (6) Ms. Lounds's requests for job training had been denied; (7) "[e]thnic slurs and racially based jokes continue[d] even after [she] . . . voiced [her] objections," *id.* at 340; (8) she felt "extreme tension" at work after complaining of racial comments, which decreased the quality of her health, *id.*; (9) she felt threatened by Mr. Kunz, who discussed lynching and Hitler "be[ing] proud of him," *id.* at 341; and (10) she disliked being around Mr. Kunz because he engaged in slapping and punching as horseplay and sometimes said he was "crazy," *id.*  Ms. Lounds stated that these concerns represented "a small fraction of the situations that took place."  *Id.* at 341.

## C

In March 2013—after filing timely charges of discrimination with the Equal Employment Opportunity Commission and receiving her notice of right to sue—Ms. Lounds filed a lawsuit in the United States District Court for the District of Kansas, bringing claims of unlawful discrimination and retaliation. When asked during her August 2013 deposition what conduct she considered racially discriminatory, she recited the remarks and incidents detailed *supra*.  She also stated that: (1) co-worker Becky Roettering referred to a car as a "black boy," *id.* at 105; (2) Mr. Kunz asked her what "skeet skeet" means in rap songs and added that "[Ms. Lounds] should know. . . .  [because] [s]he's black," *id.* at 110; (3) Mr. Kunz asked her if she agreed that rapper Nicki Minaj had a "great

17

body," *id.* at 116; (4) Mr. Kunz had "pound[ed] his fist" while saying there was "no telling what [he] would do," *id.* at 119; (5) Ms. Kraft sometimes said, "I's be's getting" or "You's be's getting," and looked at Ms. Lounds and laughed, *id.* at 111; (6) Ms. Kraft asked Ms. Lounds if she spoke Ebonics and if she ever consulted the "urban dictionary," *id.*; (7) when Ms. Kraft apologized to Ms. Lounds for various remarks, Ms. Kraft noted that she had six African-American cousins; (8) Ms. Kraft would "often ask [her] to get ghetto with certain patients," *id.*; (9) Ms. Kempke often asked her to "get ghetto," *id.* at 109; (10) Ms. Kempke reportedly requested an assignment change so that another co-worker would "work in the predominantly black neighborhood," *id.*; (11) Ms. Kraft made a remark to Ms. Lounds about missing checks; (12) a co-worker asked Ms. Lounds if her hair was a weave; and (13) Ms. Kraft asked Ms. Lounds if "they call black people coons," *id.* at 447.

Ms. Lounds also stated in her deposition that Lincare supervisors and employees retaliated against her in the following ways: (1) co-workers scrutinized her work more; (2) people scattered files and food wrappers on her desk; (3) Ms. Kraft rearranged her files and claimed that Ms. Lounds had "misplaced files," *id.* at 120; (4) Ms. Roettering falsely accused Ms. Lounds of mishandling orders and losing materials; (5) Ms. Roettering went back on an alleged promise to train Ms. Lounds; (6) Ms. Roettering forged Ms. Lounds's name on a work order; (7) the company began to complain about Ms. Lounds's absences and absence-texting;

18

and (8) people said, "Shh, be quiet or you might get HR called on you," *id.* at 116, when she joined employee meetings.

After the close of discovery and a full round of briefing, the district court granted summary judgment to Lincare. The court first determined that no reasonable jury could have found the alleged race-based harassment sufficiently severe or pervasive to sustain a hostile work environment claim under § 1981. It then opined, concerning the retaliation claim, that "the alleged retaliatory actions against [Ms. Lounds] either were not 'materially adverse' or were not caused by [her] protected activity." J.A. at 613 (Mem. & Order, filed July 9, 2014).

This timely appeal followed.

## II

Ms. Lounds's hostile work environment and retaliation claims were dismissed on summary judgment. "We review de novo the district court's grant of summary judgment on [a] § 1981 hostile environment claim[]." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1138 (10th Cir. 2008). We likewise apply de novo review when assessing the court's grant of summary judgment on a Title VII retaliation claim. *See Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009). Throughout our review, we utilize "the same standards as the district court." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011).

At this stage of the litigation, we "view all of the facts in the light most favorable to the non-movant and draw all reasonable inferences from the record in

19

favor of the non-moving party." *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006). Even so, the non-movant "must still identify sufficient evidence requiring submission to the jury to survive summary judgment." *Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007). "Summary judgment is of course appropriate if, but only if, the evidence reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008); *see* Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

Importantly, in the context of employment discrimination, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). Many of the highly fact-sensitive determinations involved in these cases "are best left for trial and are within the province of the jury." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("[T]he inquiry [at summary judgment is] whether the evidence presents a sufficient disagreement to require submission to a jury . . . ."). Consequently, "in this Circuit . . . an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve

20

the employer's [explanation for the alleged misconduct]." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1177 (10th Cir. 1998) (Tacha, J., concurring in part); *see Randle*, 69 F.3d at 452 ("[I]f . . . inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial.").

### III

The parties agree that the sole issue before us regarding Ms. Lounds's hostile work environment claim under 42 U.S.C. § 1981 is whether there was sufficient evidence to present a genuine dispute of material fact as to the pervasiveness or severity of the alleged harassment. More specifically, the question is whether Ms. Lounds has carried her burden on summary judgment to create a jury question relating to whether the alleged harassment was sufficiently pervasive or severe. We conclude that she has done so.

### A

"[Section] 1981—which declares that all persons 'shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens'—prohibits . . . racial discrimination" in the workplace. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2529 (2013) (first and second omissions in original) (quoting 42 U.S.C. § 1981). Similarly, Title VII "makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or

21

privileges of employment, because of such individual's race.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). Both statutes authorize a plaintiff to bring a claim for hostile work environment based on unlawful race discrimination. *See Hernandez*, 684 F.3d at 957; *Tademy*, 614 F.3d at 1154–55; *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007). The same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under § 1981 or Title VII. *See, e.g.*, *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997); *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994). Accordingly, we are guided in part by Title VII cases in assessing Ms. Lounds's hostile work environment claim.

In particular, the overarching "analytical framework [that] was first articulated in a Title VII case"—*viz.*, the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)—"applies . . . to claims under section 1981." *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1509 (10th Cir. 1997); *accord Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1265 (10th Cir. 2013). The parties' briefing reflects their agreement that this framework applies here. The framework proceeds as follows: "the plaintiff must first establish a prima facie case of discrimination . . . . Then, the defendant may come forward with a legitimate, non-discriminatory . . . rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's

22

proffered rationale is pretextual." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011); *see Young*, 468 F.3d at 1249.

"We have recognized that 'Title VII does not establish a general civility code for the workplace'" and that a plaintiff may not predicate a hostile work environment claim on "the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces." *Hernandez*, 684 F.3d at 957 (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir. 2012)). Therefore, to avoid summary judgment at the prima facie stage, a plaintiff must present evidence that creates a genuine dispute of material fact as to whether "the workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007) (quoting *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)). "Pervasiveness and severity are independent and equal grounds on which to support violations of § 1981." *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).

More specifically, as relevant here, to carry her burden at the prima facie stage, a plaintiff must establish the following four elements:

> (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on [race]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the

23

> plaintiff's employment and created an abusive working environment.

*Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (alteration in original) (quoting *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262 (10th Cir. 2005)).  As suggested above, the sole element at issue here is the fourth—*viz.*, whether Ms. Lounds has established that the alleged harassment was sufficiently pervasive or severe to alter the terms, conditions, or privileges of her employment.

It is important to recognize that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment" because it is inherently fact-found by nature.  *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).  "'[There] is not, and by its nature cannot be, a mathematically precise test' for a hostile work environment claim."  *Hernandez*, 684 F.3d at 957 (alteration in original) (quoting *Harris*, 510 U.S. at 22).  To the contrary, "[t]he 'totality of the circumstances' is 'the touchstone of [a hostile work environment] analysis.'"  *Id.* at 959 (second alteration in original) (quoting *EEOC v. PVNF, LLC*, 487 F.3d 790, 799 (10th Cir. 2007)).  Courts consider "a variety of factors" in this holistic analysis, "including[] 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355,

24

1365 (10th Cir. 1997) (quoting *Harris*, 510 U.S. at 23).  Moreover, courts assess whether the work environment "[is] both subjectively *and* objectively hostile or abusive."  *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (emphasis added).  In other words, it is not enough that a particular plaintiff deems the work environment hostile; it must also be of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances.  *See, e.g.*, *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997) ("The Supreme Court held that conduct within the purview of Title VII must be severe or pervasive enough to create both 'an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile'—and an environment the victim-employee subjectively perceives as abusive or hostile." (quoting *Harris*, 510 U.S. at 21–22)).

Under this rubric, the "plaintiff must show more than a few isolated incidents of racial enmity."  *Witt*, 136 F.3d at 1432 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994)).  "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."  *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994); *see Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (noting that stray, isolated "comments fall far short of the 'steady barrage' required for a hostile environment claim"); *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000) ("[S]tray racial comments should

25

typically not be admitted [in considering whether the plaintiff has shown pervasive discrimination].").

We have said that "the nuances of an environment [are] imposed by each instance of [complained-of] behavior"; in this regard, we have cautioned that we are *not* instructing courts to assess a plaintiff's hostile-workplace allegations in a vacuum. *Smith*, 129 F.3d at 1415. Indeed, the Supreme Court has emphasized that our inquiry must involve "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see Vance v. Ball State Univ.*, --- U.S. ----, 133 S. Ct. 2434, 2455 (2013) ("What qualifies as harassment? Title VII imposes no 'general civility code.'" (quoting *Oncale*, 523 U.S. at 81)). Moreover, the Court has admonished that "[w]orkplace conduct is not [to be] measured in isolation" for the purpose of resolving hostile work environment claims. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001).

We have similarly underscored that "the word 'pervasive' is not [simply] a counting measure. . . . [and requires] a broader contextual analysis" that carefully considers each instance as a component of the overall workplace milieu. *Smith*, 129 F.3d at 1415; *see Tademy*, 614 F.3d at 1143 ("Our precedent reveals no talismanic number of incidents needed to give rise to a hostile discrimination claim. . . . [W]hether a hostile environment claim is actionable depends not only on the number of incidents, but also on the severity of the incidents."). Thus, it

26

follows that there is a qualitative dimension to the pervasiveness inquiry (as well as the one for severity); logically, as relevant here, the workplace environment is likely to become more readily permeated by race-based ridicule, insult, and the like, insofar as the repeated harassing acts approach the level of severe. *Cf. Tademy*, 614 F.3d at 1144 (noting as to pervasiveness and severity, that "those two grounds 'are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . ., while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.'" (omission in original) (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002))); *EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 847 (9th Cir. 2005) (same). Much like "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance," which is the sum total of those scenes, "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario," which is informed by the sum total of those incidents. *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990)); *cf. King v. Hillen*, 21 F.3d 1572, 1581 (Fed. Cir. 1994) ("[B]y viewing each incident in isolation, *as if nothing else had occurred*, a realistic picture of the work environment [i]s not presented." (emphasis added)); Kerri Lynn Stone, *Taking in Strays: A Critique of the Stray Comment Doctrine in Employment Discrimination Law*, 77 Mo. L. Rev. 149, 177 (2012) ("[S]tray remarks can prove

to be invaluable insights into biases at every level of consciousness that may be rife but invisible within the workplace. . . . [They] may bespeak a workplace culture in which certain language or sentiments are tolerated and perhaps encouraged or rewarded.").

In this regard, our precedent unmistakably requires us to assess in our analysis comments and behavior that in many circumstances might appear to be facially neutral (i.e., devoid of any actual discriminatory animus). Particularly illuminating in that regard is our discussion in *Hernandez*, where we explained: "We have long held that '[f]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct.'" 684 F.3d at 960 (alterations in original) (quoting *O'Shea*, 185 F.3d at 1097); *cf. O'Shea*, 185 F.3d at 1097 ("[B]ecause conduct which is not gender-based may form a part of the context or environment in which the discriminatory conduct is alleged to have occurred, such conduct may be relevant to, and should be considered in, evaluating a hostile work environment claim.").[6]

---

[6] For instance, we explained in *Chavez*:

> [W]hat is important in a hostile environment claim is the *environment*, and [race]-neutral harassment makes up an important part of the relevant work environment. Conduct that appears [race]-neutral in isolation may in fact be [race]-based, but may appear so only when viewed in the context of other [race]-based behavior. Thus, when a plaintiff introduces

(continued...)

28

**B**

We now examine how the district court endeavored to apply the foregoing legal principles. Despite noting at the outset that the determination of pervasiveness or severity in hostile work environment cases "is particularly unsuited for summary judgment," J.A. at 600 (quoting *Hernandez*, 684 F.3d at 958), the district court "easily conclude[d]," *id.* at 601, that there was no genuine dispute of material fact as to whether the conduct at issue was sufficiently severe to support a hostile work environment claim. In brief fashion, it merely opined that "no opprobrious insults or epithets [were] pointed at plaintiff" and that the remarks Ms. Lounds considered offensive "were not made with animosity or scorn." *Id.* at 602. It found that the closer question was whether the record evidence revealed a disputed issue of material fact regarding the existence *vel non* of discrimination so *pervasive* as to alter the terms and conditions of Ms. Lounds's employment.

---

⁶(...continued)
> evidence of both [race]-based and [race]-neutral harassment, and when a jury, viewing the evidence in context, "reasonably could view all of the allegedly harassing conduct . . . as the product of [racial] hostility," then "it is for the fact finder to decide whether such an inference should be drawn."

397 F.3d at 833 (emphasis in original) (citation omitted) (quoting *O'Shea*, 185 F.3d at 1102, 1097). Consequently, a relevant lesson from *Chavez* is that a "[p]laintiff[] can use a substantial amount of arguably [race]-neutral harassment to bolster a smaller amount of [race]-based conduct on summary judgment." *Id.*

29

As to the pervasiveness question, the district court separately identified and considered the effect of the conduct that it determined to be, respectively, "[f]acially race-neutral statements or actions," *id.*, and "[r]acial comments or actions," *id.* at 603. In its view, the following behavior was facially race-neutral: (1) Ms. Kraft's question regarding whether Mr. Van Dever felt like a minority; (2) Ms. Kraft's comment, while apologizing to Ms. Lounds, that she had African-American cousins; (3) Mr. Kunz's remark about Nicki Minaj's physique; (4) Mr. Kunz's fist-pounding and slapping horseplay; (5) "[t]he question as to whether [Ms. Lounds's] hair was a weave," *id.*; (6) commentary about missing checks; and (7) Mr. Kunz's Hitler remark, which the court considered "boorish, but not racially offensive," *id.* Though the court acknowledged that, under our precedent it should consider such (ostensibly) race-neutral comments in its analysis, it concluded that "none of the comments or actions (viewed objectively) occurred so frequently or were so abusive as to add significantly to a hostile work environment claim." *Id.*

Having ruled regarding the alleged effect of the race-neutral conduct, the court proceeded to separately address the remaining behavior that, in its view, *could* be construed as race-based. It observed generally that several of Ms. Lounds's allegations involved "questions which implied that, as an African-American, [she] was an authority who could or should answer questions white people had about black people"—most notably, inquiries about cigarette brands,

30

names, colloquialisms, and song lyrics. *Id.* The court summarily deemed these questions merely "annoying." *Id.* at 604. But it stated with respect to remarks about the "ghetto" and the "hood" that:

> [i]f the references to going to the "ghetto" or the "hood" were made mockingly as a racial slight, then a reasonable jury would consider them offensive. If the statements were a sincere expression of unease, a reasonable jury could find them slightly offensive in the manner they were worded. Here, the record does not suggest that the comments were *directed to embarrass or aggravate plaintiff.* Plaintiff also complains that she was asked if she lived in the "ghetto." A reasonable jury might consider this question to be racially offensive and annoying.

*Id.* at 604–05 (emphasis added). And, similarly, the court classified Ms. Kraft's "get ghetto" directive to Ms. Lounds as "slightly offensive" at best, rather than abusive under the hostile workplace rubric. *Id.* at 607.

As for Mr. Kunz's comment about "lynching," the court concluded that a reasonable jury would deem it only "mildly offensive." *Id.* at 605. In that regard, the district court noted that Mr. Kunz told Ms. Lounds that he was "not trying to offend" and observed that "[i]t [wa]s not uncommon for people to voice a desire to take short-cuts towards 'justice.'" *Id.* Though the court acknowledged that "many people would criticize the statement for good reasons," it concluded that "a reasonable jury would not consider the comment, in this context, to be more than mildly offensive." *Id.*

In discussing co-workers who allegedly greeted Ms. Lounds by saying "yo" and "what's up," the district court declared, "[These comments] were not directed

31

solely toward plaintiff and there's no indication that *their purpose* was to insult or ridicule plaintiff." *Id.* at 606 (emphasis added). Likewise, as to Ms. Kraft's "yes, massa" instruction, the court reasoned that the remark "was more of a poorly-stated directive . . . to be obsequious towards a corporate executive than an effort to offend plaintiff." *Id.*

Turning to the "boom nigga" and "peace out my nigga" comments, the district court acknowledged that the statements "could be considered racially offensive by a reasonable jury" and could potentially "sting." *Id.* But the court was not persuaded that the remarks could have the deleterious effect of altering the terms or conditions of Ms. Lounds's employment because they were not directed specifically at Ms. Lounds, and they "were not hostile in the sense of being intentionally antagonistic or scornful." *Id.* at 607. It applied similar reasoning to Ms. Kraft's statements about the African-American job applicant who ostensibly "looked like a convict," Ms. Kraft's office-wide remarks about Ms. Lounds's first name, and the customer's commentary about "wetbacks." At bottom, the district court concluded that there was "no evidence that the statements were made to insult or antagonize plaintiff." *Id.* at 608. After reviewing the timeline of Ms. Lounds's hostile-workplace averments, the court stated that it "believe[d] the series of statements . . . could not reasonably be considered to amount to a steady barrage of opprobrious comments." *Id.* at 610. Thus, given its rejection of both the pervasiveness and severity bases, the district

32

court concluded that Lincare was entitled to summary judgment on Ms. Lounds's hostile work environment claim.

## C

In urging reversal regarding her hostile work environment claim, Ms. Lounds reminds us that most claims of this type—including hers—are inappropriate for resolution at the summary-judgment phase of litigation. *See O'Shea*, 185 F.3d at 1098 ("[T]he severity [or] pervasiveness evaluation is particularly unsuited for summary judgment . . . ."); *accord Hernandez*, 684 F.3d at 958. She argues that the district court incorrectly applied the summary-judgment standards by failing to construe evidence of a hostile work environment in the light most favorable to her, the non-movant, and by resolving factual disputes in Lincare's favor. In particular, though expressly disclaiming any argument that "a threshold number of instances can definitively establish a hostile work environment claim as a matter of law," Reply Br. at 10, Ms. Lounds contends that the district court "reached the wrong conclusion because it analyzed each allegation individually, rather than considering the totality of the circumstances and its cumulative effect," Aplt. Opening Br. at 38. Furthermore, Ms. Lounds contends that the district court legally erred in focusing on whether the alleged harassers had benign intent, rather than on the subjective and objective environmental effects of the harassers' conduct.

33

We believe that Ms. Lounds's arguments, in substance, accurately convey the flaws in the district court's analysis. Having properly applied the governing legal standards to this record, we conclude that the district court committed reversible error in granting summary judgment to Lincare on her hostile work environment claim. Specifically, construing the facts in the light most favorable to Ms. Lounds, we discern from this record a genuine dispute of material fact regarding whether the alleged harassment was pervasive. Because this provides an independent ground for reversing the district court regarding the hostile work environment claim, we need not (and do not) opine on whether the alleged acts of harassment could be deemed severe. In sum, we conclude that the district court committed error by resolving the merits of the hostile work environment claim in Lincare's favor at summary judgment.

**1**

The focus of Ms. Lounds's attack is the district court's analysis of alleged harassing incidents that the court deemed to be race-based. Ms. Lounds does not question the accuracy of the court's classification of certain conduct within the identified universe of alleged harassing incidents as race-based. Nor does she challenge the district court's separate analysis of the legal import of its categorized race-neutral and race-based conduct. One may certainly question the wisdom of Ms. Lounds's approach in light of our precedent. Specifically, our caselaw indicates that explicitly race-based conduct should not be viewed in

34

isolation in determining whether a workplace environment is sufficiently polluted with racially offensive harassment. *See, e.g.*, *Hernandez*, 684 F.3d at 960. Indeed, as we discerned in *Chavez*, a holistic analysis may actually unearth the racial dimension of conduct that may superficially appear to be race-neutral. 397 F.3d at 833 ("Conduct that appears [race]-neutral in isolation may in fact be [race]-based, but may appear so only when viewed in the context of other [race]-based behavior."); *cf. O'Shea*, 185 F.3d at 1097 (noting as to behavior that is not explicitly gender-based that "if it reasonably could be inferred that the conduct was related to gender or arose out of a context in which admittedly sex and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn"). We are not, however, in the business of making arguments for the parties. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (noting adherence to the "principle of party presentation[,] . . . . rely[ing] on the parties to frame the issues for decision"); *Utah Poultry Producers Co-op. v. Union Pac. R.R. Co.*, 147 F.2d 975, 977 (10th Cir. 1945) ("[I]t is not necessary for us to decide this [issue], because this is not the issue *as framed by the parties*." (emphasis added)). Therefore, in conducting our review, we also focus on the legal significance of the conduct that the district court classified as race-based.

At least through that restricted lens, as the district court suggested, the pervasiveness question is arguably a close one. *Cf. Herrera*, 474 F.3d at 681, 683

(where plaintiff's supervisor, *inter alia*, repeatedly referred to him when speaking with other co-workers as "the fucking Mexican," concluding that the evidence of pervasiveness was sufficient, but "present[ed] a close question"); *cf. also Al-Kazaz v. Unitherm Food Sys., Inc.*, 594 F. App'x 460, 463 (10th Cir. 2014) (collecting cases from other circuits where plaintiffs were "continually subjected to offensive comments"); *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 336 (4th Cir. 2010) (holding that the pervasiveness element was satisfied in a case involving copious evidence of "sex-based hostility"). But the pervasiveness inquiry "is not [simply] a counting measure. . . . [but rather requires] a broader contextual analysis," *Smith*, 129 F.3d at 1415, and it "by its nature cannot be, a mathematically precise test,'" *Hernandez*, 684 F.3d at 957 (quoting *Harris*, 510 U.S. at 22). Thus, we decline to transmute our hostile work environment analysis into a simple comparison game. The dispositive question is whether there was sufficient evidence of pervasiveness on this record such that the district court should have given a jury "the opportunity to evaluate the evidence, demeanor, and candor of witnesses" and make the ultimate determination. *Tademy*, 614 F.3d at 1146. And we conclude that there was. Put another way, we conclude that the incidents of racially offensive harassing conduct that the district court identified were sufficiently pervasive to create a genuine dispute of fact regarding the hostility of the environment—*viz.*, a fact better resolved by a jury than a judge.

36

**2**

We have carefully set forth these race-based incidents above; we need not repeat the full litany here. More pertinent to our principled resolution of this case is explaining why it appears that the able district court reached a different conclusion than we do regarding the legal significance of these race-based facts. We conclude that one central reason the court did so is that it discounted the offensiveness of key elements of the conduct based on its conclusions regarding the ostensibly benign intent of the alleged harassing actors. In other words, as Ms. Lounds suggests, the district court legally erred in focusing on whether the actors intended to be offensive or to cause harm—especially to Ms. Lounds—rather than on whether a reasonable jury could find that the subjective and objective effect of their conduct was to pollute the environment with harassing conduct that was, *inter alia*, racially humiliating, offensive, or insulting. This legal error was given enhanced effect by the court's not infrequent tendency not to construe the facts in the light most favorable to Ms. Lounds.

A district court's assessment on summary judgment of whether a workplace environment is sufficiently polluted for purposes of a § 1981 claim should not be based on whether an alleged harasser possessed the motivation or intent to cause discriminatory harm or offense. *See Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991) (noting that "Title VII is not a fault-based tort scheme"); *see also Rogers v.*

37

*EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (opinion of Goldberg, J.) ("[T]he thrust of Title VII's proscriptions is aimed at the consequences or effects of an employment practice and not at the employer's motivation."), *abrogated on other grounds by EEOC v. Shell Oil Co.*, 466 U.S. 54, 62 n.11 (1984); *cf. Tademy*, 614 F.3d at 1142–43 ("[W]hether Mr. Cagle's comment was racially motivated and what effect it had on Mr. Tademy are judgments of the sort we are not equipped to make as an appellate court reviewing a cold record. Nor were they appropriate for the district court in ruling on a summary judgment motion."); Michael J. Frank, *The Social Context Variable in Hostile Environment Litigation*, 77 Notre Dame L. Rev. 437, 521 (2002) ("Because it is hard to tell what a harasser's true motivations are, . . . critics argue that it is best to leave this question to the jury . . . ." (footnote omitted)).

The district court's failure to adhere to the foregoing legal principles seemingly led it to minimize the polluting *effect* on the workplace environment of the alleged harassers' conduct. More specifically, the district court repeatedly erred by discounting the discriminatory environmental effect of the alleged harassers' actions by focusing on their ostensibly benign motivation or intent. In this regard, the court repeatedly focused on whether the alleged harassers: had the "purpose . . . to insult or ridicule [Ms. Lounds]"; acted "for the purpose of offending [Ms. Lounds]"; or made statements that were "hostile in the sense of being intentionally antagonistic or scornful." J.A. at 606–07. The court

38

uniformly answered these mental-state queries in Lincare's favor, finding that the alleged harassers acted with benign intent. In the court's apparent view, its mental-state findings provided a justification for discounting the offensiveness of the identified racially discriminatory harassing conduct. And the apparent ultimate consequence of this minimization was that—though the district court specifically identified more than a few isolated race-based incidents—it concluded that Ms. Lounds had not carried her prima facie burden on summary judgment to create a genuine dispute regarding pervasiveness. Put more generally, the court found that "a reasonable jury could not conclude that plaintiff was made to suffer an abusive working environment or that the offensive remarks and actions were so negative and insulting or humiliating that they created a discriminatory working condition or a hostile work environment." J.A. at 611.

**a**

Two salient examples from this record should illustrate both the contours of the problem and the magnitude of its detrimental impact on the district court's analysis. These two examples involve matters that courts frequently have found to be appropriate for jury consideration (and thus not appropriate for rejection at the summary-judgment phase) due to their potentially powerful race-based effect: (1) the use of the word "nigger"—more specifically, the variant, "nigga"; and (2) the reference to "lynching."

39

We turn first to the use of "nigga" at Lincare.  Construing the facts in the light most favorable to Ms. Lounds, the term "nigga" was repeatedly uttered at Lincare within earshot of Ms. Lounds by her co-worker, Ms. Kempke.  Notably, the term was used in connection with Ms. Kempke's habitual refrain, "Boom Nigga."[7]  The term "nigga" is a variant of the term "nigger."  *See, e.g.*, Randall Kennedy, *Nigger: The Strange Career of a Troublesome Word* 4 (Vintage Books ed., 2003) ("*Nigger* and other words related to it have been spelled in a variety of ways, including niggah . . . ."); *Nigga*, Dictionary.com, http://dictionary.reference.com/browse/nigga (last visited Dec. 19, 2015) (noting that the term "nigga" is an "alteration of nigger").

---

[7]  Ms. Kempke also allegedly used the term "nigga" in connection with her remark "Peace Out my Nigga."  However, the testimony of Ms. Lounds herself establishes that she never heard Ms. Kempke utter this statement. Therefore, this use of the term "nigga" arguably should be given no legal effect in the hostile work environment analysis.  *See Hirase-Doi v. U.S. W. Commc'ns*, 61 F.3d 777, 782 (10th Cir. 1995) ("[Defendant] correctly asserts that [the plaintiff] may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment. . . .  [The plaintiff] could not subjectively perceive [the harasser's] behavior towards others as creating a hostile work environment unless she knew about that behavior."), *abrogated on other grounds by Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *accord Tademy*, 614 F.3d at 1146.  In any event, for our purposes, it suffices that Ms. Kempke habitually uttered the term "nigga," when exclaiming "Boom Nigga." Furthermore, we also are aware that, according to Ms. Lounds, she actually heard the term "nigger" one time in the Lincare workplace, when Ms. Renard was describing the meaning of "BON"—though Ms. Renard denies using the term. Even if we were to accept Ms. Lounds assertion in this regard, the singular use of the term "nigger" would have a negligible impact on our analysis.  Without more, it would amount to no more than a stray instance of this specific term.  *See, e.g.*, *Witt*, 136 F.3d at 1432.

Some of our sister circuits have offered helpful commentary on the potentially strong polluting power of this the time-worn word, "nigger." For instance, the Fourth Circuit has said: "'[T]he word "n* * * *r" is pure anathema to African-Americans,' as it should be to everyone." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422 (4th Cir. 2014) (citation omitted) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)). "Therefore," it reasoned, "when viewing the circumstances as a whole, we find the use of the word 'n* * * *r,' coupled with the on-going offensive racial talk, . . . is sufficient evidence for a reasonable jury to find the race-based harassment was objectively severe or pervasive." *Id.* And the D.C. Circuit has similarly opined:

> [A] reasonable jury could find Cooper and Wagner's behavior sufficiently severe or pervasive as to create a hostile work environment. To begin with, Cooper (allegedly) used a deeply offensive racial epithet when yelling at [Plaintiff] to get out of the office. As other courts have observed, "perhaps no single act can more quickly alter the conditions of employment" than "the use of an unambiguously racial epithet such as 'nigger' by a supervisor." This single incident might well have been sufficient to establish a hostile work environment.

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (citation omitted) (quoting *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)); *see also Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 356 (8th Cir. 1997) ("[U]se of the word [nigger] even in jest could be evidence of racial antipathy." (quoting *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 114 (7th Cir. 1990))); Kennedy, *supra*, at 22 ("Over the years, *nigger* has

41

become the best known of the American language's many racial insults, evolving into the paradigmatic slur.").

To be sure, the term used at Lincare was "nigga" and not the related term, "nigger." We acknowledge that, in certain contexts, some people might discern a distinction between the two terms and view the former as less offensive. *See, e.g.*, Kennedy, *supra*, at 4 ("Currently, some people insist upon distinguishing *nigger*—which they see as exclusively an insult—from *nigga*, which they view as a term capable of signaling a friendly salutation."). However, we are confident that this is the kind of question that should be left to the judgment of a reasonable jury. *See, e.g.*, Dictionary.com, *supra* (noting that "[m]any people consider this word ['nigga'] to be equally as offensive as *nigger*"); Stephen R. Frost, *What is the difference between "nigga" and "nigger*," The Pioneer (Feb. 27, 2014), http://thepioneeronline.com/20399/opinions/what-is-the-difference-between-nigga-and-nigger (noting that "whether it ends in -a or -er, the first thing that comes to mind is a negative image of a black person"). Thus, construing the facts in the light most favorable to Ms. Lounds, we view the two terms as equivalent.

In addressing the repeated use in the Lincare workplace of this powerfully charged racial term, the district court acknowledged that the term "could be considered racially offensive by a reasonable jury." J.A. at 606. But, significantly, the court found the "potential sting of these statements" to be "mitigated" by context, noting that the "Boom Nigga" statement was not made

"for the purpose of offending plaintiff," and indeed was not "made directly to plaintiff." *Id.* Yet, as we have observed, whether the alleged harasser's purpose or intent was to do harm—that is, whether the term "nigga" (i.e., "Boom Nigga") was spoken by Ms. Lounds's co-worker with the intent to offend or harm her—is legally immaterial. The important question is whether the repeated utterance of this term had *the effect* of contributing to the creation of a racially hostile work environment. As a consequence of improperly focusing on the harasser's motivation, the district court mitigated the environmental effect of what historically has been a powerfully potent discriminatory race-based term. In other words, the court's error skewed its legal assessment of the effect of this evidence.

Second, we discern a similar salient analytical failing in the district court's evaluation of another category of evidence present here: a "lynching remark." References to lynching have frequently been recognized by our sister circuits to be potent evidence of invidious racial discrimination, which lends powerful support to a claim of hostile work environment. *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 667 (2d Cir. 2012) (unmistakably classifying "references to lynching" as "threats"); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) ("[A] racial slur evocative of lynchings [is a] significant exacerbating factor[ ] in evaluating the severity of the racial hostility."); *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999)

43

(calling a letter referencing lynching the "most disturbing evidence" of severe racial harassment and finding in plaintiff's favor).

For our part, we have dealt with the subject of lynching in an analogous context in *Tademy*. There, in assaying the severity of the allegedly harassing conduct, we unequivocally rejected the notion that a reasonable jury could not infer that the noose that the plaintiff encountered in a work area was a "racist symbol." *Tademy*, 614 F.3d at 1142. We observed that "courts have recognized that a noose may constitute part of a hostile environment claim." *Id.* at 1141.

Construing the evidence in the light most favorable to Ms. Lounds, Mr. Kunz's lynching comment explicitly invoked the specter of race: he clearly discussed the desirability of inflicting this punishment on an African-American male for murder and, by contrast, explained that he did not wish to indiscriminately throw a "noose" on and hang people in a historically African-American neighborhood. Mr. Kunz expressly forged a nexus between lynching and race and interjected the subject into Lincare's workplace environment. Consequently, a reasonable jury could "easily find" that the *effect* of his reference to lynching was to conjure up "an egregious act of discrimination calculated to intimidate African-Americans." *Id.* at 1145.

Yet, the district court focused on Mr. Kunz's ostensibly race-neutral intent or motivation, and, more specifically his explanation that he was "not trying to offend" Ms. Lounds, J.A. at 605. It concluded that the effect of Mr. Kunz's

44

discussion of lynching—which expressly and necessarily involved an invocation of the mental image of a noose, a "potent and threatening symbol for African-Americans," *Williams v. N.Y.C. Hous. Auth.*, 154 F. Supp. 2d 820, 825 (S.D.N.Y. 2001)—would be viewed as only "mildly offensive by a reasonable jury," J.A. at 605. The district court's analysis starkly reveals the legal error discussed above—focusing on the ostensibly benign intent of the alleged harasser, rather than the *effect* of the harasser's actions—as well as the consequences of that error in this case, an undue minimization of the significance of the harassing conduct in the pervasiveness inquiry.

And the court's legal error was reinforced by its interpretation of the facts. As in *Tademy*, the district court's factual interpretation "does not comport" with controlling summary-judgment principles, *see* 614 F.3d at 1141, which require courts to construe the facts and the inferences from them in the light most favorable to the nonmovant—i.e., Ms. Lounds. The court observed that "[i]t is not uncommon for people to voice a desire to take short-cuts towards 'justice.'" J.A. at 605. In this view of the record, the thrust of the message that Mr. Kunz was injecting into Lincare's workplace environment was his desire—quite apart from race—for "vigilante justice." *Tademy*, 614 F.3d at 1145. However, given Mr. Kunz's own express invocation of race and the well-recognized nexus between race and lynching, we are confident that a reasonable jury could very well have found that, even if a justice short-cut was on Mr. Kunz's mind, the

45

effect of his lynching discussion was to trigger mental or emotional associations of "an egregious act of discrimination calculated to intimidate African-Americans." *See id.* In sum, the district court's interpretation of Mr. Kunz's lynching comments also well illustrates the reason that we are constrained to reject its ruling on the pervasiveness question.

**b**

In the end, the district court committed legal error by focusing on whether the alleged harassers intended to be offensive or to cause harm—especially to Ms. Lounds—rather than on whether a reasonable jury could find on this record that the subjective and objective effect of their conduct was to pollute the environment with harassing conduct that was, *inter alia*, racially humiliating, offensive, or insulting. This legal error was bolstered by the court's not infrequent disregard for the legal directive on summary judgment to construe the facts in the light most favorable to Ms. Lounds.

We conclude that the court here should have perceived a genuine dispute of material fact regarding pervasiveness: a rational jury could find that Ms. Lounds's workplace was permeated with discriminatory conduct that was sufficiently pervasive to alter the terms and conditions of her employment. More specifically, as relevant to this appeal, we conclude that Ms. Lounds carried her burden at the summary-judgment phase regarding the severity-*or*-pervasiveness component of her prima facie case. *See, e.g.*, *Harsco*, 475 F.3d at 1186. Consequently, the

district court should not have deemed Ms. Lounds's case amenable to resolution on summary judgment. We reach our conclusion here quite cognizant of our longstanding view that a hostile work environment claim is "particularly unsuited for summary judgment" disposition. *O'Shea*, 185 F.3d at 1098; *see PVNF, LLC*, 487 F.3d at 798 ("[T]he pervasiveness of the hostility is 'quintessentially a question of fact' and thus particularly unsuited for resolution on a motion for judgment as a matter of law." (quoting *O'Shea*, 185 F.3d at 1098)). We are constrained to reverse the district court's judgment in favor of Lincare regarding Ms. Lounds's hostile work environment claim.

### D

We underscore that it is undisputed that the sole issue before us for resolution with respect to Ms. Lounds's hostile work environment claim is whether she created a genuine dispute of material fact on this record regarding the severe-*or*-pervasive component of her prima facie case. Lincare has sought to remind us in its appellate briefing that (as it reads the record) almost all of the alleged harassing conduct ceased after January 27, 2012, when Ms. Lounds lodged her complaint with Mr. McCarthy and Lincare human resources; Lincare very shortly thereafter imposed discipline on the key alleged harassers—Ms. Kraft, Mr. Kunz, and Ms. Kempke. In this regard, Lincare posits the following: "In all of her numerous complaints, 'rebuttals,' 'memorandums,' and meetings with Lincare HR, Lounds never brought up any specific new statements after the

January 27th complaint (with the exception of the two comments attributed to Renard). All she did was recycle the same allegations, over and over again." Aplee. Br. at 47. However, Ms. Lounds contends that there are genuine issues of material fact regarding the duration of the harassing conduct. Ultimately, we need not attempt to reach an opinion on this subject. Even if we assume that Lincare is correct—*viz.*, most of the alleged harassing conduct occurred prior to January 27—we would still conclude that Ms. Lounds's pervasiveness showing was legally sufficient, even if only minimally so.

As for Lincare's disciplinary action, we see no reason why this should impact our assessment of the sufficiency of Ms. Lounds's prima facie evidence prior to January 27.[8] This is not to say that Lincare's disciplinary action cannot conceivably have a significant effect in future proceedings. *See, e.g., Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012) ("We view the facts in Ms. Bertsch's favor, and while none of the summary judgment evidence may meet the severity threshold, there is a genuine issue of material fact whether the conduct was pervasive enough to find in her favor. Yet her claim still must be dismissed,

[8]    Indeed at oral argument, Lincare's counsel acknowledged that, assuming that Ms. Lounds could otherwise establish for purposes of summary judgment the pervasiveness component of her prima facie case (which of course Lincare's counsel maintained she could not), Lincare's disciplinary action would not have the effect of nullifying this showing, though it could form the basis for a defense to ultimate § 1981 liability. *See* Oral Arg. at 25:26–26:08.

because Overstock's prompt remedial action precludes employer liability.");
*Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1069 (10th Cir. 2007) ("[T]he employer's liability for allowing a sexually hostile work environment after it is reported to the employer by the employee arises only if the employer fails to take adequate remedial and preventative responses to any actually or constructively known harassment."); *see also Adler*, 144 F.3d at 676 ("An employer is not strictly liable for all harassment of which it actually or constructively knew; it may discharge its obligation by taking appropriate remedial or preventative action."). However, Lincare has not made a meaningful defensive argument against liability before us based upon its disciplinary action. Therefore, any such argument is waived on appeal, and we decline to consider the matter.

## IV

Ms. Lounds also contends that the district court erred in granting summary judgment in favor of Lincare on her Title VII retaliation claim. Because we discern no reversible error in this aspect of the court's ruling, we affirm.

## A

"[R]etaliation against an employee because she has 'opposed' any practice made unlawful by Title VII," such as creating or condoning a hostile work environment, is forbidden. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (quoting 42 U.S.C. § 2000e-3(a)). "[A] plaintiff bringing a retaliation

49

claim 'must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways.'" *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224–25 (10th Cir. 2008)). She may either (1) offer direct evidence that retaliation "played a motivating part" in an employment decision adverse to her interests, or (2) rely upon circumstantial evidence under "the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation." *Fye*, 516 F.3d at 1225; *accord Estate of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1238 (10th Cir. 2014); *see Debord v. Mercy Health Sys. of Kan.*, 737 F.3d 642, 655 (10th Cir. 2013) (noting that "[w]here, as here, the plaintiff does not have direct evidence of retaliation, we follow the three-step framework from *McDonnell Douglas*").

Under *McDonnell Douglas*'s burden-shifting rubric, the plaintiff must first establish a prima facie case of retaliation by proving "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (footnote omitted). Satisfying the second component of this prima facie case requires a showing that the "materially adverse" action was "such that [the

plaintiff] might be dissuaded from making a charge of discrimination," *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008); satisfying the third (i.e., causal connection) requires "evidence that . . . the motive for the adverse action was her opposition to [unlawful] discrimination," *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189 (10th Cir. 2002). The plaintiff may demonstrate a causal nexus between her protected conduct and the adverse employment action "by proffering 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Stover*, 382 F.3d at 1071 (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999)); *see Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[T]he closer [the challenged action] occurred to the protected activity, the more likely it will support . . . causation.").

Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to the defendant (i.e., employer) to "come forward with a legitimate, . . . non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Crowe*, 649 F.3d at 1195. Stated otherwise, (1) if the plaintiff discharges her initial burden by making an adequate prima facie case, (2) the defendant must shoulder the burden of rebutting it by justifying on legitimate grounds the employment action at issue; and (3) the final onus is on the plaintiff to show—by a preponderance of the evidence—that the defendant's explanation is

a pretext intended to conceal an impermissible retaliatory motive. *See Estate of Bassatt*, 775 F.3d at 1238.

"Pretext can be inferred from evidence revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation . . . ." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). It may also be alleged "by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated." *Jaramillo v. Adams Cty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether "a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted [non-retaliatory] reasons." *Crowe*, 649 F.3d at 1196 (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).

### B

### 1

Before the district court, the parties jousted about several aspects of the controlling framework in their summary-judgment briefing. With respect to Ms. Lounds's prima facie retaliation case, Lincare argued (1) that much of the conduct to which she objected could not be considered materially adverse to her interests,

and (2) that "those disciplinary actions which *were* 'materially adverse' were not motivated or caused by [Ms. Lounds's] protected activity" of filing a complaint with the KHRC. J.A. at 614 (emphasis added). For her part, Ms. Lounds argued, *inter alia*, that the temporal proximity of the discipline she received to the filing of her KHRC complaint could permit an inference of retaliatory motive—which, standing alone, could satisfy her prima facie burden.

Lincare then presented evidence to establish that its reason for disciplining Ms. Lounds, and eventually terminating her employment, was legitimate and business-related: namely, that Ms. Lounds had accrued excessive unscheduled absences, many of which were improperly reported through text messages. Not surprisingly, Ms. Lounds vigorously disputed Lincare's proffered rationale. In urging the court to view the company's justification of absenteeism as a pretext for illegal retaliation, she lodged numerous challenges, including that: (1) discretion to issue discipline for poor attendance was vested in Ms. Kraft; (2) Ms. Kraft had made racially offensive comments; (3) Ms. Kraft had approved some of Ms. Lounds's absences, suggesting that the discipline was unrelated to attendance; (4) Lincare had disregarded its progressive-discipline policy; and (5) one of Ms. Lounds's co-workers was not disciplined for reporting an absence through a text message.

The district court stated, with regard to Ms. Lounds's temporal-proximity theory of causation, that it would "[a]ssum[e] that this [wa]s sufficient to produce

53

a prima facie case of retaliation." *Id.* at 619. It then determined that Lincare had carried its burden by offering the justification of excessive absenteeism, noting that Ms. Lounds had not denied that she was frequently absent or that attendance was an important aspect of her job. Finally, the court determined that, on this summary-judgment record, none of Ms. Lounds's arguments would convince a reasonable jury that Lincare's stated reason for disciplining Ms. Lounds was pretextual.

First, the district court concluded, Ms. Lounds's averment that Lincare had disregarded its progressive-discipline policy was not borne out by the record. The court then discerned nothing unusual about vesting Ms. Kraft with discretion to discipline employees for poor attendance, "particularly when the only evidence suggest[ed] that the policy was applied evenhandedly." *Id.* at 621. In that vein, the court rejected Ms. Lounds's contention that because *some* of her many absences had been excused or approved, Lincare was foreclosed from arguing that her *cumulative* attendance record was unacceptable. It also determined that the remarks attributable to Ms. Kraft for purposes of this claim, which "did not begin [until] *after* [Ms. Lounds] engaged in protected activity . . . [, did] not substantiate a retaliatory motive." *Id.* (emphasis added). Lastly, the court was not moved by Ms. Lounds's discussion of a texting co-worker; it found "no evidence of how often [that co-worker] texted in absences," whereas it found sufficient "evidence that [Ms. Lounds] (who apparently was absent more

54

frequently than [her co-worker]) continued to text-in absences even after she was warned against the practice." *Id.* at 623.

**2**

We hold that Lincare was entitled to judgment as a matter of law on Ms. Lounds's claim of unlawful retaliation and therefore affirm this aspect of the district court's ruling. We appropriately apply the *McDonnell Douglas* rubric because in our view the record reflects no direct evidence of retaliation. And Ms. Lounds does not argue to the contrary. It is beyond peradventure that we may affirm on any basis supported by the record. *See, e.g.*, *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). Accordingly, unlike the district court, we elect to hold that, even assuming that Ms. Lounds has established her prima facie case, her claim ultimately fails on the pretext component of the *McDonnell Douglas* standard. More specifically, we conclude that Ms. Lounds marshaled no convincing evidence to show that Lincare's justification for disciplining and terminating her was pretextual.[9]

---

[9] In our view, the most prudent course is to assume without deciding that Ms. Lounds has established the prima-facie-case component of her claim that when Lincare disciplined her, it did so in order to retaliate against her for complaining of discrimination to KHRC. In that regard, we observe that Ms. Lounds's first official discipline—the April 26, 2012, documented counseling—occurred twenty days after she filed her first KHRC complaint. Lincare claims that the brief time period between these events "is purely coincidental," yet it nonetheless "concedes that [Ms.] Lounds can at least make a *prima facie* retaliation case simply from th[is] close timing." Aplee. Br. at 54. Nevertheless, because we conclude that she has failed to present convincing

(continued...)

Indeed, we easily conclude from our assessment of the summary-judgment evidence that the evidence would *not* support a jury finding that Lincare's true purpose in disciplining and terminating Ms. Lounds was to retaliate against her for opposing discrimination. On this record, we find it patent that Lincare deems employee attendance vital to its business model and strongly disfavors absenteeism. We find it equally apparent that, as germane here, Lincare made it a priority to correct what it perceived to be a mounting attendance problem concerning Ms. Lounds. *See, e.g.*, J.A. at 207 (Feller Dep., dated Oct. 14, 2013) (remarks by Ms. Feller that "we need to have employees who are respectful of the . . . very strict attendance requirement[]" of "be[ing] prompt and present for a full 8:00-to-5:00 workday," and that Ms. Lounds repeatedly flouted that standard by not "hav[ing] a Plan B" for contingencies); *id.* ("Some employers could [not] care less when people wander in and out. That's not the way we operate at Lincare."); *id.* at 238–39 (remarks by Ms. Adams that "Lincare has strict attendance requirements," that Ms. Lounds had "far more unscheduled absences than anyone else," and that workplace efficiency suffered even where, as here, "one employee [wa]s absent"); *id.* at 253 (Schanbacher Aff., dated Nov. 20, 2013) ("I examined [Ms.] Lounds'[s] attendance record . . . . [Her] number of absences

---

[9](...continued)
evidence that Lincare's legitimate, non-retaliatory rationale for disciplining and firing her—excessive absenteeism—was mere pretext meant to conceal a prohibited motive, we determine that her retaliation claim is deficient as a matter of law.

is absolutely unacceptable.").  Indeed, on her first day of work, Ms. Lounds

signed a document listing, *inter alia*, her mandatory hours, proper absence-

reporting protocol, and the requirement of securing approval for "personal

business" absences.  *Id.* at 354 (Measures of Performance, dated Sept. 27, 2011).

We emphasize that the main inquiry we undertake concerning this claim on

appeal is whether Ms. Lounds has shown that, in justifying *her* discipline and

termination, Lincare relied upon the foregoing attendance policies as a smoke

screen for an improper retaliatory motive.  Ms. Lounds faces an uphill battle in

that regard.  Her overarching thesis—which involves nothing more than a

collection of skeletal averments of "implausibility, inconsistency, and

contradiction" by Lincare, Aplt. Opening Br. at 59—is insufficient as a matter of

law to justify any detailed discussion by us here.[10]  *See, e.g.*, *United States v.*

---

[10]    The most developed argument we have extracted from Ms. Lounds's
briefing (though it does not present a cognizable issue for appellate review) is
that the timing of her documented counseling, without more, conclusively shows
pretext.  As with her other theories, the only evidence Ms. Lounds offers to
support this averment is her own self-serving testimony.  However, it is enough to
note our circuit's unmistakable position that "temporal proximity alone is
insufficient to raise a genuine issue of material fact concerning pretext." *Proctor
v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007); *accord Annett v.
Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004).  In other words, temporal
proximity is only one factor that can give rise to a finding of pretext; it must be
"combined with other evidence proffered by [the plaintiff] [to] create[] a
reasonable inference that [the employer's] asserted reason [for discipline] is
unworthy of belief." *Proctor*, 502 F.3d at 1213.  We do not "[a]llow[ ] 'very
close' temporal proximity to operate as a proxy for this evidentiary requirement."
*Annett*, 371 F.3d at 1241.

*Pursley*, 577 F.3d 1204, 1231 n.17 (10th Cir. 2009); *Bronson v. Swensen*, 500

F.3d 1099, 1105 (10th Cir. 2007).

Indeed, having carefully reviewed the challenged disciplinary actions, we

find it pellucid that Ms. Lounds's theory of inconsistent action by Lincare lacks

the evidentiary support necessary to create a genuine dispute of material fact.

Quite the reverse is true: Lincare distinctly communicated to Ms. Lounds its

position that her absences and texting practices were unacceptable.  Further, days

after human-resources personnel verified that Ms. Lounds "ha[d] more absences

than any other current employee in the [Wichita] center," J.A. at 248 (Feller

Email, dated Apr. 23, 2012), Lincare admonished her for this deficiency.  The

documented counseling listed sixteen unscheduled days in Ms. Lounds's first

seven months of employment and reminded her not to send text messages about

absences. *See* J.A. at 334.  Thereafter, the documented verbal warning

enumerated seven *additional* full-day, unscheduled absences and reiterated that

the company's policy "prohibits texting to report your absence." *Id.* at 309.  And

the final written warning noted that Ms. Lounds had "called in on July 9 and July

20, continuing the trend" of "excessive unscheduled absences." *Id.* at 317.

Thus, given Ms. Lounds's well-documented track record of flouting

company attendance policies,[11] it should hardly have come as a surprise when

_____

[11]    On appeal, Ms. Lounds renews her argument that Lincare's failure to
follow its progressive-discipline policy supports a finding of pretext.  She offers
                                                              (continued...)

Lincare decided that nearly a year's worth of such unprofessional conduct

warranted severing ties, to wit:

> Your absenteeism continues to be excessive. In accordance with Lincare's Corrective Action Process, you were issued a Counseling on April 26, 2012. On June 22, 2012, you received a Verbal Warning. Your Final Written Warning was dated July 24, 2012. Since that time, you have missed seven additional full days. In all, since your hire date of September 27, 2011, you have missed thirty-four (34) full days of work. Some of those thirty-four days were scheduled and approved in advance, but the vast majority of the missed days were unscheduled absences.
>
> Lincare employees in their first year of employment earn five days of vacation. Clearly, you have exceeded that total allotment.
>
> Your ongoing, excessive absenteeism continues to be a disruption to the business. Consequently, your employment is being terminated effective immediately.

*Id.* at 337.

Ultimately, given the thoroughly speculative nature of Ms. Lounds's pretext

theories, we are satisfied that the district court correctly found no genuine dispute

of material fact as to whether Lincare truly disciplined and terminated Ms.

---

[11](...continued)
no evidence to support this contention. In any event, our discussion of her employment history demonstrates that this contention lacks merit. The "normal sequence" detailed in the company handbook appears to have been followed to the letter: (1) counseling by Ms. Kraft, her immediate supervisor; (2) a documented verbal warning; (3) a final written warning indicating that termination could be the next step in the process; and (4) discharge. J.A. at 182. Indeed, as stated in the handbook, the sequence *could* have begun "with a more severe step." *Id.*

Lounds because of her excessive absenteeism. Lincare therefore properly prevailed at summary judgment on this claim.

In sum, even assuming that Ms. Lounds has made a prima facie retaliation case, we conclude that Lincare was entitled to summary judgment (1) because it advanced a legitimate, non-retaliatory reason—absenteeism—for taking adverse employment actions against her, and (2) because Ms. Lounds, who merely advanced speculative theories to rebut that rationale, failed to demonstrate that Lincare's stated reason for its disciplinary actions was pretextual. Consequently, we affirm this aspect of the district court's ruling.

## V

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment on the retaliation claim and **REVERSE** the court's grant of summary judgment to Lincare on Ms. Lounds's hostile work environment claim, and **REMAND** the case for further proceedings consistent with this opinion.