**PUBLISH**

**October 4, 2018**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

CHARLES PAYAN,

     Plaintiff - Appellant,

v.

UNITED PARCEL SERVICE; CHARLES
MARTINEZ,

     Defendants - Appellees.

No. 16-4188

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:14-CV-00400-JNP)**

_____

April L. Hollingsworth, Hollingsworth Law Office, LLC, Salt Lake City, Utah, for
Plaintiff-Appellant.

Steven M. Gutierrez, Holland & Hart, LLP, Denver, Colorado, (Bradford J. Williams,
Holland & Hart, LLP, Denver, Colorado and Cecilia M. Romero, Holland & Hart, LLP,
Salt Lake City, Utah, with him on the brief) for Defendants-Appellees.

_____

Before **BRISCOE**, **SEYMOUR**, and **LUCERO**, Circuit Judges.

_____

**SEYMOUR**, Circuit Judge.

_____

Charles Payan appeals the district court's grant of summary judgment in favor of United Parcel Service ("UPS") in relation to his claims for racial discrimination and retaliation arising under Title VII and 42 U.S.C. § 1981, as well as his state law claims for breach of contract and breach of the covenant of good faith and fair dealing. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I.

Mr. Payan, who is Hispanic, has worked for UPS since 1991. He worked his way through the ranks and in 2006 was promoted to Security Manager of the Desert Mountain Salt Lake City Division. Around 2009, Charles Martinez, also Hispanic, became the supervisor of UPS's Great Basin District, which encompassed the Salt Lake City security division. This made Mr. Martinez Mr. Payan's direct supervisor.

Mr. Payan was considered a "Ready Now" candidate until Mr. Martinez informed him in early 2010 that he no longer considered him to be "ready now." UPS uses the "Ready Now" list to determine candidates for promotions, so Mr. Payan's removal from the list meant that he could no longer be considered for promotions. Mr. Martinez continued thereafter to rate Mr. Payan's promotion status as "Retain at Current Level," meaning he believed Mr. Payan needed more time to develop before being promoted. After Mr. Payan's downgrade, two UPS employees with similar credentials were promoted to Security Division Managers, positions that Mr. Payan wanted but was not eligible for in light of his promotion status downgrade.

2

Mr. Martinez also consistently gave Mr. Payan poor Quality Performance Reviews ("QPR"). A QPR is performed biannually and is how UPS evaluates its employees. The QPR has both an objective and subjective component, the results of which impact salary increases and opportunities for promotion. While Mr. Payan scored incredibly well on the objective component of his 2009 QPR, performing at 106% of his goals, Mr. Martinez rated him very poorly on the subjective component of the QPR. For instance, Mr. Martinez gave him a .58 out of 1 rating on the Leadership Competency Assessment.

Mr. Payan asserts that Mr. Martinez was constantly harassing him, and he documented most of those interactions with hand-written notes. Some of those interactions raised allegations of harassment concerning Mr. Payan's race or national origin, which are the focus of this action. The district court recounted those instances:

> First, on one occasion, Martinez and Payan had a heated conversation during which Martinez indicated that Payan had an integrity issue and called him a kid who doesn't even speak Spanish. Second, Payan asserts that Martinez would often correct his pronunciation of Hispanic surnames. Finally, Payan points to Martinez's friendship with another Hispanic manager who speaks fluent Spanish as evidence of Martinez's racial animus towards Payan. One of Martinez's best friends growing up was a Cuban-American, and Martinez expressed his fondness for the Cuban accent of the other Hispanic manager.

Aplt. App. at 182-83.

The district court documented UPS's reaction to Mr. Payan's claims of racial discrimination as follows:

> In 2010, Payan contacted Human Resources Manager Carl Wesley to discuss his concern that Martinez was discriminating against him on the basis of his race. Wesley worked down the hall from Martinez in UPS's Phoenix office. Wesley was good friends with Martinez and the two socialized together outside of work. Payan raised the issue of his poor

3

performance evaluation with Wesley, and Wesley acknowledged that the conflict between Payan's objective numbers and Martinez's rating were a cause for concern. In light of his continuing concerns about racial discrimination, Payan filed a complaint with UPS Human Resources in February 2012. Wesley assigned Payan's complaint to Human Resources Operations Manager Darren Moore and Area Manager Carolee Streeper to investigate Payan's complaint. Payan continued to object to Martinez's conduct throughout 2012 and 2013. UPS investigated Payan's claims but determined that Martinez had neither discriminated against nor harassed Payan. Following this investigation, UPS initiated a meeting between Payan and Martinez in an effort to clear the air. UPS also offered Payan an opportunity to participate in the Company's Employee Dispute Resolution process, but Payan declined. During this timeframe, in 2012, Wesley had a discussion with Martinez regarding Payan. Following this discussion, Martinez decided to document the perceived performance issues intertwined with Payan's complaints to Human Resources. Ultimately, Martinez recommended to Wesley that Payan be transferred and not retained at his current management level. As a basis for his recommendation, Martinez pointed to perceived integrity and communications issues.

*Id.* at 183-84.

In November 2012, and in response to the recommendations of Mr. Martinez, UPS put Mr. Payan through a Management Performance Improvement Process ("MPIP"). An MPIP is designed to "help employees who are not performing well go through a formalized training with their manager to help them improve their skill sets so they can perform effectively and eliminate whatever those deficiencies are." *Id.* at 305. "UPS tasked Payan with improving his communication, organization, and development of subordinates." *Id*. at 184.

The MPIP required Mr. Payan to meet with Mr. Martinez and UPS's HR department to track his progress. These meetings took place in November 2012 and January, February, and March 2013. After his second review, UPS determined that

Mr. Payan was not meeting the plan's requirements. Shortly thereafter, Mr. Payan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Mr. Payan alleged that he had been subjected to harassing and degrading behavior from Mr. Martinez and that his non-Hispanic coworkers were not treated in such a way. He also alleged that UPS retaliated against him by placing him on an MPIP. The EEOC ultimately dismissed Mr. Payan's charge of discrimination and issued him a right-to-sue letter.

After the MPIP concluded in October 2013, "UPS transferred Mr. Payan to a Business Manager position in the operations department." *Id*. at 184. The new position had the same management authority, and he continued to lead his own team of employees. Moreover, Mr. Payan was not required to change work locations, the transfer came with a pay increase, and Mr. Martinez would no longer be his supervisor. Nevertheless, Mr. Payan perceived the transfer to be a punishment, and in May 2014 he filed the current lawsuit. He alleged hostile work environment, disparate treatment, and retaliation claims under both Title VII and 42 U.S.C. § 1981. He also alleged state law claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of Utah public policy. The district court granted summary judgement in favor of UPS on all of Mr. Payan's claims.

II.

5

"We 'review a district court's grant of summary judgment de novo, applying the same legal standard as the district court,'" viewing "the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *City of Eudora v. Rural Water Dist. No. 4, Douglas Cty., Kan.*, 875 F.3d 1030, 1034 (10th Cir. 2017) (quoting *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A. Disparate Treatment Race Discrimination Under Title VII and § 1981

"In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005)). The analysis for both claims starts with the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, "the plaintiff must first prove a prima facie case of discrimination." *Khalik v. United Air Lines,* 671 F.3d 1188, 1192 (10th Cir. 2012). "Only after the plaintiff clears this initial hurdle does the burden shift to the employer to prove a 'legitimate, non-discriminatory reason for the adverse employment action.'" *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (quoting *Khalik*, 671 F.3d at 1192). "To make out a prima facie case of discrimination, the . . . Plaintiffs must demonstrate (1) membership in a protected class, (2) adverse employment

6

action, and (3) disparate treatment among similarly situated employees." *Orr v. City Of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citation omitted). Unlike a hostile work environment claim, where the "claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice,"' *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)), a claim for disparate treatment is based on a discrete act, *id*. at 114.

The district court determined that Payan's Title VII claim was unexhausted and that his Section 1981 claim was untimely. We agree with both conclusions. First, the court concluded that Payan's EEOC charge "d[id] not allege that the downgrading of his performance rating was discriminatory." Aplt. App. at 192. Indeed, Payan's EEOC charge includes allegations of: (1) "unwarranted subjective criticism of [Payan's] work performance"; (2) better treatment of non Hispanic peers, including through the receipt of higher pay raises; and (3) retaliation for reporting alleged discrimination in the form of an MPIP. *Id*. at 404. The EEOC charge omits any discussion of Martinez's downgrading of Payan's promotion status from "ready now" to "retain at current level," allegations on which Payan's disparate treatment claim is based.

The district court relied on our prior precedent and dismissed Mr. Payan's claim on jurisdictional grounds. *See Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005) (stating exhaustion is a "jurisdictional prerequisite to suit under Title VII"). This conclusion was correct at the time, but since then we have reexamined the issue en banc and concluded that "a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense

7

of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." *Lincoln v. BNSF Ry.,* No. 17-3120, slip op. at 20-21 (10th Cir. Aug. 17, 2018). In practical terms, this holding means that the defense of failure to timely exhaust a Title VII claim "is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans. World Airlines*, 455 U.S. 385, 393 (1982).

UPS argued under the now-abrogated framework, claiming that exhaustion is a "jurisdictional prerequisite to suit under Title VII," *Shikles*, 426 F.3d at 1317, and that Mr. Payan's claims should be dismissed because they are unexhausted. Because UPS is unable to predict the future, it could not have argued in a way that perfectly aligns with our post-*Lincoln* treatment of exhaustion by raising Mr. Payan's failure to exhaust as an affirmative defense. We therefore treat UPS's argument, which was proper under then-existing precedent, as having "raise[d] an affirmative defense of failure to exhaust," *Lincoln*, No. 17-3120, at 20-21, and conclude that the district court did not err in dismissing Mr. Payan's Title VII disparate treatment claim.[1]

Nor was Mr. Payan's § 1981 claim for disparate treatment timely filed. Section 1981 has a four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). The discrete discriminatory act in this case, as alleged by Mr.

---

[1] We also agree with the district court's conclusion that, even if it were exhausted, the EEOC charge would be untimely. Under Title VII, a person must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice before filing a lawsuit in federal court. 42 U.S.C. § 2000e-5(a). Mr. Payan did not file his charge of discrimination until March 2, 2013, *see* Aplt. App. at 404, well after the 300-day filing restriction. In fact, Mr. Payan conceded during oral argument that he failed to exhaust this claim. *See* Oral Argument at 5:55-6:10.

Payan, is that UPS "took adverse employment actions against [him] due to his race, by down-grading him from a 'Ready Now' to a 'Three-Year' candidate." Aplt. App. at 16. That down-grade occurred in January 2010.[2] *Id.* at 243, pp. 16-17. Mr. Payan contends the statute of limitations clock did not begin to run until October 2010, asserting that this was when the change in employment status actually took effect. The district court pointed out the problem with this argument:

> Payan, however, fails to cite any evidence in the record that supports his claim that the status did not change at the time he was informed of it. Because the only evidence in the record, Payan's own deposition testimony, supports UPS's position that the change of status took place in early 2010, the court finds that Payan's claims filed in May 2014 are untimely.

Aplt. App. at 193. We agree that because Mr. Payan did not file this lawsuit until May 28, 2014, after the four-year mark, he failed to timely file his § 1981 claim.

## B. Hostile Work Environment Under Title VII and § 1981

Here too "[t]he same substantive standards apply" under Title VII and Section 1981. *Lounds v. Lincare, Inc.*, 812 F. 3d 1208, 1221 (10th Cir. 2015). To carry his burden, Mr. Payan must show: "(1) [he] is a member of a protected group; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on race; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment."

---

[2] Mr. Payan's complaint stated that Mr. Martinez became his supervisor in November 2009 and "[w]ithin two months of the time Martinez became his supervisor, Mr. Payan dropped from 'Ready Now' status to a 'Three-Year' candidate, meaning he was considered ready to be promoted in three years." Aplt. App. at 12.

*Id.* at 1222 (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (alterations in original)).

Mr. Payan satisfies elements one and two. He is Hispanic and thus a member of a protected group. He was also subject to unwelcome harassment: Mr. Martinez regularly singled Mr. Payan out during weekly conference calls, where he was "abusive, critical, and condescending to . . . Payan." Aplt. App. at 640.

But Mr. Payan's claims fail at element three. He does not "produce evidence from which a rational jury could infer that []he was targeted for harassment because of h[is] gender, race, or national origin." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004). He contends that Mr. Martinez harassed him because he is Hispanic. In support, he argues that Mr. Martinez treated him differently than he treated Mr. Payan's colleagues. *See* Aplt. Br. at 33. He also points to Mr. Martinez's comments about his inability to speak Spanish, such as Mr. Martinez's statement that he was a "kid that doesn't even speak Spanish." *Id.* at 34; Aplt. App. at 243, p. 5.

As a preliminary matter, the fact that Mr. Martinez is also Hispanic does not mean that he cannot harbor animus toward Hispanics. *See Castaneda v. Partida*, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). The record indicates, however, that Mr. Martinez did not display animus toward other Hispanics. For example, he was good friends with a Cuban-American subordinate, Jorge Bertot. Aplt. App. at 675. This undercuts Mr. Payan's contention that Mr. Martinez's alleged harassment of him was

10

because he is Hispanic. His argument basically is that Mr. Martinez disliked him not because he is Hispanic but because he did not speak Spanish. As the district court noted, "the law provides no special protection for discrimination based on one's poor grasp of a particular language." *Id.* at 190.

Although we need not address the fourth element, the severity of the harassment, Mr. Payan's claims fail here as well. "Title VII does not establish 'a general civility code' for the workplace." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). "Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Id.* at 664. To survive summary judgment "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval*, 388 F.3d at 1326–27 (quoting *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir.1998)). To do so, a plaintiff must show an environment that was both objectively and subjectively hostile. *Morris*, 666 F.3d at 664. We assess the "objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, *considering all the circumstances*." *Id.* (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007)). In evaluating the circumstances, we "consider[] such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

11

unreasonably interferes with an employee's work performance." *Id.* (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832-33 (10th Cir. 2005) (internal quotation marks omitted)).

In this case, the district court held that Mr. Payan's handwritten notes documenting his interactions with Mr. Martinez constituted inadmissible hearsay and were therefore not evidence of harassment. Without that evidence, the court determined that "while Payan has produced evidence that he subjectively perceived his work environment to be hostile and abusive, he has not come forward with any admissible evidence of an objectively severe or pervasive hostile work environment." Aplt. App. at 189. We review this evidentiary ruling for abuse of discretion and "will not reverse if the district court's ruling 'falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical.'" *United States v. Willis*, 826 F.3d 1265, 1270 (10th Cir. 2016) (quoting *United States v. Sturm*, 673 F.3d 1274, 1286 (10th Cir. 2012)).

The district court did not abuse its discretion here because our precedents establish that the court's ruling falls within permissible bounds in the circumstances of this case. For example, in *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995), we held that "the nonmoving party need not produce evidence in a *form* that would be admissible at trial, but the content or substance of the evidence must be admissible." (Internal citation omitted). As we explained, "hearsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment because '[a] third party's description of [a witness'] supposed testimony is not

12

suitable grist for the summary judgment mill.'" *Id.* (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

With his notes excluded, Mr. Payan was only able to offer a few examples of alleged harassment, and those few examples do not rise to the level of "discriminatory intimidation, ridicule, and insult" that is necessary for a hostile work environment claim. Mr. Payan testified in his deposition about Mr. Martinez's anger and aggression, his comments about Mr. Payan being a liar and incompetent as a manager, his questions to Mr. Payan about out-of-work appointments, and his grilling of Mr. Payan on work-related matters. Mr. Payan further contends that Mr. Martinez postponed completing his career development evaluation, did not travel from Arizona to Utah to "help him," "refused to call Payan to discuss issues and, Payan felt, was generally trying to ruin [his] career." Aplt. Br. at 32. Finally, Mr. Payan points to the declarations of Jerry Barbillon and Dave VanGorder, other Security Managers, to support his claims. Mr. Barbillon noted that Mr. Martinez was disrespectful, critical, condescending, and abusive toward Mr. Payan during weekly conference calls. *See* Aplt. App. at 640. Mr. VanGorder said that Mr. Martinez also regularly emphasized Mr. Payan's poor performance during the meetings, even though his division always did well compared to the other ones. *See id.* at 645. He attested that, "Martinez treated Mr. Payan the worst of all of the Security Managers that he supervised, including myself, on our conference calls." *Id.* While Mr. Payan may have subjectively believed that Mr. Martinez's harassment was severe, we are not persuaded that it was objectively sufficient to create the required pervasively hostile and abusive working environment.

In sum, we conclude the district court correctly held Mr. Payan failed to show either that Mr. Martinez's alleged harassment was due to a racial animus or that it was sufficiently severe or pervasive to constitute a hostile work environment under either Title VII or Section 1981.

## C. Retaliation Under Title VII and § 1981

Turning to Mr. Payan's retaliation claim, a "prima facie case of retaliation requires the plaintiff to show that (1) he or she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008). Mr. Payan clearly engaged in protected opposition when he persistently complained to HR about Mr. Martinez's actions, which he perceived to be racially motivated. As to the second requirement, Mr. Payan argues that his placement on the MPIP and his subsequent transfer both constitute adverse employment actions. We disagree.

We "liberally define [ ] the phrase adverse employment action. . . . Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (citations and internal quotation marks omitted). To qualify as an adverse employment action, however, an "employer's actions must be harmful to the point

14

that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

For reasons we set out below, we conclude that Mr. Payan's placement on the MPIP did not constitute an adverse action. We find the holding in *Cole v. Illinois*, 562 F.3d 812 (7th Cir. 2009), instructive. There Ms. Cole, who worked as a receptionist in the Governor's Office of Citizen's Assistance, was injured in a car accident one day on her lunch break. *Id*. at 813. She was granted medical leave for approximately two and half weeks under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. Her doctor cleared her to return to work on a part-time basis after her official leave time had elapsed, but her transition did not go well. Her supervisor became upset at her constant absence and sent her an email stating, "I understand that you're going through a lot right now but this can't keep happening." *Cole*, 562 F.3d at 814. Her supervisors ultimately decided to place her on an employee improvement plan.

The plan was designed to last approximately one month and identified three areas for improvement: attendance, attitude, and job performance. The plan set forth an explanation of her deficiencies in each category as well as suggested solutions for correcting them. Ms. Cole declined to sign the improvement plan and was eventually fired. *Id*. She filed a lawsuit alleging, inter alia, retaliation for exercising her rights under the FMLA. She argued that her placement on the improvement plan

15

constituted an adverse action.  The district court disagreed and granted the defendant's motion for summary judgment.  *Id.* at 815.

The Seventh Circuit affirmed.  The court first noted that "materially adverse actions are not limited to employment-related activities but include any actions that would dissuade a reasonable employee from exercising his rights."  *Id*. at 816 (quoting *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008)); *see also Burlington Northern*, 548 U.S. at 68.  But the court further noted that "it is important to separate significant from trivial harms," and that "[t]he decision to take FMLA leave 'cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'"  *Id*. (quoting *Burlington Northern*, 548 U.S. at 68).  The court reasoned that the improvement plan would not cause a reasonable employee to forego exercising her rights:

> The most onerous aspect of the improvement plan was the requirement that Cole submit daily and weekly schedules to Verblen and Brown. Although the task of preparing daily plans would necessitate some extra work, this requirement is not so oppressive that a reasonable employee would be discouraged from taking FMLA leave. Presumably, a reasonable employee plans her day. The mere act of submitting a daily plan to one's superiors is not an additional burden of great concern. Rather, it can be seen as a constructive assignment that, when executed, could improve an employee's work habits and productivity.
>
> In addition to the planning requirements, the plan also obligated Cole to "become more aware of her tone" and to "work[ ] on becoming a better listener." Such minor conditions would not dissuade a reasonable person from exercising her rights. Cole was not deprived of responsibility, hours, pay, or any other relevant accoutrement of her position. Indeed, "not everything that makes an employee unhappy is an actionable adverse action."  Accordingly, the improvement plan was not a materially adverse action.

16

*Id*. at 816-17 (internal citations omitted).

Similarly, the improvement plan in this case would not cause a reasonable employee to forego exercising his rights under Title VII. Mr. Payan was given four areas for improvement: written communication, verbal communication, planning and organization, and managing of subordinates. His requirements for improvement, like the requirements in *Cole*, were not onerous. They included attending one meeting every month to check his progression, using a daily planner to improve his organization, and coordinating developmental meetings with his subordinates. None of these tasks were difficult or especially time-consuming, and it was all aimed at improving Mr. Payan's work habits and productivity. Mr. Payan's charge of discrimination did not immunize him from any attempt by his employer to improve deficiencies in his job performance. Accordingly, we join the Seventh Circuit and many others[3] in concluding that placement on an employee improvement plan alone does not qualify as a materially adverse action as defined by *Burlington Northern*.

With respect to Mr. Payan's transfer, we have previously said a reassignment does not constitute an adverse action when it "involved no hardship to the plaintiff other than

---

[3] *See, e.g.*, *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015) (unpublished) (citing *Burlington* and concluding a PIP not materially adverse employment action where plaintiff continues to engage in protected activity); *Edwards v. Nat'l Vision Inc.*, 568 F. App'x 854, 862 (11th Cir. 2014) (unpublished) (stating placement on a PIP not an adverse action); *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 n.2 (8th Cir. 2014) (plaintiff's "placement on the PIP alone does not constitute an adverse employment action and cannot support her claim of retaliation"); *Choulagh v. Holder*, 528 F. App'x 432, 438 (6th Cir. 2013) (unpublished) ("The placement on the performance improvement plan . . . do[es] not rise to the level of a materially adverse action.").

the requirement to develop new skills." *Hillig*, 381 F.3d at 1033 (citing *Tran v. Trs. of State Colls. in Colo*, 355 F.3d 1263, 1268 (10th Cir. 2004) (no adverse action where unqualified plaintiff was reassigned to new department because transfer did not result in loss of employment, compensation, or benefits)). Mr. Payan did not suffer any hardship due to his transfer. He was transferred to a position with the same level of management authority, was not required to change locations, was no longer under the supervision of Mr. Martinez, and actually received a pay increase. The only piece of admissible evidence Mr. Payan proffered for his claim that the transfer was an adverse action was a single declaration by a former coworker who stated, "In my experience as a manager at UPS (which was about 14 years), when a staff member is moved to Operations, it is considered a form of discipline. I saw it happen several times." Aplt. App. at 645. We conclude, as did the district court, "that Payan has failed to identify sufficient evidence to demonstrate that the reassignment would dissuade a reasonable employee from engaging in protected opposition." *Id.* at 197-98.

**D. Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**

Mr. Payan also appeals the district court's dismissal of his claims for breach of contract and breach of the implied covenant of good faith and fair dealing. In Utah, courts "presume . . . employment contracts are at-will." *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 976 (Utah 2009). "But a 'plaintiff/employee may overcome this presumption by showing that the parties created an implied-in-fact contract, modifying the employee's at-will status.'" *Tomlinson v. NCR Corp.*, 345 P.3d 523, 527 (Utah 2014)

18

(quoting *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 333 (Utah 1992)).  An implied

contract "may arise from a variety of sources including personnel policies or provisions

of an employment manual." *Cabaness v. Thomas*, 232 P.3d 486, 502 (Utah 2010) (citing

*Canfield v. Layton City*, 122 P.3d 622, 626 (Utah 2005)).  But a "clear and conspicuous

disclaimer, as a matter of law, prevents employee manuals or other like material from

being considered as implied-in-fact contract terms." *Tomlinson*, 345 P.3d at 529 (quoting

*Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991)).

In this case, the alleged implied contract stems from the non-retaliation policy in

UPS's Code of Business Conduct.  In October 2012, after Mr. Payan made a complaint to

HR, UPS gave Mr. Payan a stand-alone copy of a page from its code of conduct titled

"UPS Business Code of Conduct RETALIATION."  Aplt. App. at 930.  It provides, in

pertinent part, that "[a]nyone who retaliates against another employee for reporting

known or suspected violations of our legal or ethical obligations is in violation of the

Code and subject to disciplinary action, up to and including dismissal." *Id.*  This

language did not create an implied-in-fact contract because the same manual included a

clear and conspicuous disclaimer on its back cover:

> The Code of Business Conduct is not an express or implied contract of
> employment and does not create any contractual rights of any kind between
> UPS and its employees. In addition, all employees should understand the
> Code does not modify their employment relationship, whether at will or
> governed by contract.

*Id*. at 488.  Not only is this disclaimer clear and conspicuous, Mr. Payan stated in his

deposition that he did not believe the Code of Business Conduct created any contractual

19

rights between himself and UPS.[4]  We agree with the district court that "[w]hile UPS endeavored to ensure its policies were followed by employees and made this a significant part of its company culture, such conduct is not sufficient to create a contract under Utah law." Aplt. App. at 199.  Because Mr. Payan had no employment contract with UPS, the district court's grant of summary judgment on Mr. Payan's breach of contract and breach of implied covenant of good faith and fair dealing claims was proper.[5]

The decision of the district court is **AFFIRMED**.

---

[4] Mr. Payan testified:
> Q: Do you believe the Code of Business Conduct created contractual rights between you and UPS?
> A: No.

Aplt. App. at 222.

[5] In his opening brief, Mr. Payan also argued that a separate, stand-alone non-retaliation policy he signed in 2013 provides a basis for his breach of contract claim. *See* Aplt. Br. at 26-27.  However, Mr. Payan did not rely on or cite the 2013 anti-retaliation policy in his brief below.  Any argument he makes in reliance on the 2013 policy has therefore been forfeited. *See Tele-Comm., Inc. v. C.I.R.*, 104 F.3d 1229, 1233 (10th Cir. 1997) ("Propounding new arguments on appeal in an attempt to prompt us to reverse the trial court undermines important judicial values. In order to preserve the integrity of the appellate structure, we should not be considered a 'second-shot' forum, a forum where secondary, back-up theories may be mounted for the first time.")